IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

KNOXVILLE DIVISION

----------------------------------------------------------------
                                      :
UNITED STATES OF AMERICA,             :
                                      :
                Plaintiff,            :
                                      :
v.                                    :          3:21-CR-38
                                      :
BENJAMIN ALAN CARPENTER,              :
also known as Abu Hamza,              :
                                      :
                Defendant.            :
----------------------------------------------------------------
                                  Knoxville, Tennessee
                                  April 5, 2021


           BEFORE:   THE HONORABLE DEBRA C. POPLIN
                     UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

          FOR THE PLAINTIFF:

          CASEY THOMAS ARROWOOD
          Assistant United States Attorney
          United States Department of Justice
          Office of the United States Attorney
          800 Market Street, Suite 211
          Knoxville, Tennessee  37902


          FOR THE DEFENDANT:

          BENJAMIN GERALD SHARP
          Federal Defender Services
          800 South Gay Street
          Suite 2400
          Knoxville, Tennessee  37929-9714


                     DETENTION HEARING

INDEX OF PROCEEDINGS

DENISE CARPENTER
    Direct Examination by Mr. Sharp. . . . . . . . . . . .   39
    Cross-Examination by Mr. Arrowood. . . . . . . . . . .   45
    Redirect Examination by Mr. Sharp. . . . . . . . . .   54

GOVERNMENT'S EXHIBITS

| NUMBER | DESCRIPTION | RECEIVED |
|---|---|---|
| 1 | Indictment | 34 |
| 2 | Redacted Search Warrant Affidavit | 34 |
| 3 | *From Dabiq to Rome*, Newsletter Issue #28 | 34 |
| 4 | *From Dabiq to Rome*, Newsletter Issue #29 | 34 |
| 5 | *From Dabiq to Rome*, Newsletter Issue #30 | 34 |
| 6 | Photograph from Search of Premises | 34 |
| 7 | ATP Group Communications | 34 |
| 8 | Photograph from Search of Premises | 34 |
| 9 | ATP Group Communications | 34 |
| 10 | USAO-NDIL Press Release (September 20, 2016) | 34 |
| 11 | U.S. Department of the Treasury Press Release (September 10, 2019) | 34 |
| 12 | Radio Free Europe Article (October 24, 2019) | 34 |
| 13 | U.S. Department of Justice (August 30, 2019) | 34 |
| 14 | Press Association Regions Newswire Article: West Midlands (October 19, 2020) | 34 |
| 15 | Article:  "The Issue of Beheading" | 34 |

UNITED STATES DISTRICT COURT

GOVERNMENT'S EXHIBITS (Continuing)

| NUMBER | DESCRIPTION | |
|--------|-------------|---|
| 16 | Article: "The Islamic Ruling on the Permissibility of Self-Sacrificial Operations" | 34 |
| 17 | Article: "A Treatise on the Legal Status of Using Weapons of Mass Destruction Against Infidels" | 34 |
| 18 | Article: "Ruling on Fighting Americans Outside Iraq" | 34 |
| 19 | Article: "The Clarification Regarding Intentionally Targeting Women and Children" | 34 |
| 20 | Video: *For the Sake of Allah* | 34 |
| 21 | Video: *The Rank* | 34 |
| 22 | ATP Group Communications | 34 |
| 23 | ATP Group Communications | 34 |
| 24 | ATP Group Communications | 34 |
| 25 | Amended Pretrial Services Report | 34 |

- - -

THE COURTROOM DEPUTY: This court is again in session, with the Honorable Debra C. Poplin, United States Magistrate Judge, presiding. Please come to order.

We are here for a video detention hearing in Case 3:21-CR-38, United States of America versus Benjamin Carpenter.

Here on behalf of the government is Casey Arrowood.

Is the government ready to proceed?

MR. ARROWOOD: Good afternoon, Your Honor. Present and ready to proceed.

THE COURT: Good afternoon.

THE COURTROOM DEPUTY: And here on behalf of the defendant is Benjamin Sharp.

Is the defendant ready to proceed?

MR. SHARP: Yes, Your Honor. Good afternoon.

THE COURT: Good afternoon.

(Brief pause.)

THE COURT: Okay.

We need to just pause for a moment. Ms. Stone was saying we need to connect the telephone.

While we're doing that, I just want to remind everyone, while we're conducting this by video, you are to conduct yourself as if you're sitting in the courtroom. So give your full attention to the Court, and please try not to distract the proceedings.

(Brief pause.)

THE COURT: And while she is still doing that, I'll address Mr. Carpenter.

Can you see and hear me?

THE DEFENDANT: Yes, ma'am.

THE COURT: All right. If you have any difficulty during the proceeding, with either the audio or the video, just give me some sort of indication, and we will pause and try to remedy the situation. We haven't had a lot of difficulty with that, but I do just want to let you know that you can try to give me some sort of indication so we can take care of any issues. Okay?

THE DEFENDANT: All right. Thank you.

THE COURT: All right.

Okay. Looks like we are ready to proceed.

So we are here for the scheduled detention hearing.

And so, Mr. Arrowood, I will turn to you.

MR. ARROWOOD: Thank you, Your Honor, and good afternoon. Your Honor, today the government --

THE COURT: Good afternoon.

MR. ARROWOOD: -- today the government would like to proceed by way of proffer. And we've provided the Court with a binder full of proposed exhibits; I believe there were 24 in that binder. We've also provided the Court with a disk which for the most part contains the same information that's in the

binder. I'll talk a little bit in a few moments about the differences there. We've also provided --

THE COURT: All right.

MR. ARROWOOD: We've also provided a copy of the binder to defense counsel, and as well as a copy of the disk, and I provided it to defense right about the same time that I provided it to the Court last week.

What I'd like to do today is go through those exhibits and provide some context for each. I think for -- for most of the exhibits it will become apparent how they're relevant to issues that will be addressed today before the Court, but I'm also happy to discuss why if there's a question about why a particular exhibit relates to some of the issues that we believe the Court should address during this hearing.

And then once I go through all the exhibits, Your Honor, there may be a few additional points that I'd like to proffer, and then that will conclude the proffer portion of -- of the government's presentation. And then of course afterwards, at a time that the Court directs, I'd also like to provide argument in support of detention here, Your Honor.

THE COURT: All right. Thank you.

MR. ARROWOOD: Okay.

THE COURT: All right.

MR. ARROWOOD: So beginning with-- Sorry. Go ahead, Your Honor. I'm sorry.

THE COURT: Just a moment. Before we proceed, and hopefully to make this go a little bit more smoothly, if I could ask Mr. Sharp, so you were given the binder and the disk. Did you have an opportunity to review that? I just want to see if -- anticipate any potential objections before he starts going through all the exhibits.

MR. SHARP: Yes, Your Honor, I have had an opportunity to review the exhibits. I do understand that we are at a detention hearing and the rules of evidence are a little more relaxed --

THE COURT: Mm-hmm.

MR. SHARP: -- however, I do think that I would have a standing relevance objection to a lot of these exhibits. My understanding——and Mr. Arrowood can correct me if I'm wrong——there is not an allegation that Mr. Carpenter was the translator on any of these exhibits that are being presented here today.

THE COURT: Okay.

Knowing that, Mr. Arrowood, if you could try to address that issue as you -- as you go along.

And, Mr. Sharp, if you could just have your standing objection, and then the Court can give whatever weight is due in its consideration. I would just like to be able to go through everything without having to stop with numerous objections.

So does that sound okay with the parties?

MR. SHARP: It does, Your Honor. And, again, that would just be a standing objection to relevance. I would ask the Court to take whatever weight the Court feels is appropriate.

THE COURT: Okay. Certainly. I will do that.

All right. Back to you, Mr. Arrowood.

MR. ARROWOOD: Okay. Thank you, Your Honor.

Exhibit 1 is the indictment in the case. It's Document Number 3 on the docket. It's a publicly available document. This indictment charges the defendant with one count of attempted provision of material support to a designated foreign terrorist organization. The indictment further identifies that terrorist organization as the Islamic State of Iraq and al-Sham, which I'll refer to as ISIS throughout this hearing, which it's commonly known as.

The indictment further alleges that the defendant's criminal conduct occurred beginning on or about January 30th of 2021 and concluding on or about February 14th of 2021. The indictment also alleges that the defendant has an alias. That alias is Abu Hamza.

Your Honor, Exhibit Number 2 -- Exhibit 2 is a redacted version of a search warrant affidavit that was executed. This relates to a search of the defendant's residence which occurred on or about the date of his arrest.

The government has redacted certain portions of this affidavit, and in essence redacted out the information that we don't believe is relevant for the Court in its consideration of detention. We have left unredacted all the facts that we believe are relevant for detention.

On this point as well, Your Honor, for context, the government, at the initial appearance, asked the Court to unseal this search warrant for purposes of providing it to the defense counsel only. So the defense counsel has had an unredacted version of this search warrant since, I believe, March 24th of 2021.

THE COURT: All right.

MR. ARROWOOD: All right. So, moving on, Your Honor, Exhibits 3, 4, and 5 are all somewhat similar, and so for -- for context, Your Honor, the defendant is the founder and leader of a very well-known pro-ISIS media organization known as Ahlut-Tawhid Publications. It will be referred to as ATP throughout this hearing. That's also how it's referred to in Exhibit 2, which is the search warrant affidavit.

ATP publishes pro-ISIS media, or has published pro-ISIS media in a variety of forums over time. Some of those have been on the Internet, various websites, like Wordpress or Archive.

They've also published material through social media applications as well. One of the ways in which ATP has

published its pro-ISIS material is through the publication of a newsletter.  And what's depicted in Exhibits 3, 4, and 5 are editions of that newsletter.  The newsletter is called *From Dabiq to Rome*, and Exhibit 3 is Issue 28, Exhibit 4 is Issue 29, and Exhibit 5 is Issue Number 30.  These all contain pro-ISIS media in English, and the provided -- in short, really, for an example for the Court to see the type of media that ATP produces.  I believe there's approximately 60 of these, among other types of translations.  But we think these are particularly relevant, Your Honor.

So, for example, with Exhibit Number 3, this is *From Dabiq to Rome*, Issue Number 28.  On the first page, Your Honor, you see a photograph of the Twin Towers in New York City, one of which has been hit by an aircraft on 9/11. I note at the bottom of that page, right in the center, is a circle with a little emblem in it.  Based on the investigation, we believe that that emblem is ATP's logo.

And so what's contained further in Issue Number 28 is a series of articles, begin- -- Page 1 of the exhibit has a picture of Osama bin Laden, and then proceeds for several different pages that include a number of pro-ISIS articles. And then beginning on Page 8 of Exhibit 3 is a section of the newsletter called News Headlines.  And this section, as the name suggests, includes a number of summaries of ISIS-related perceived military successes.  So this goes on for a few

pages. And then on Page 10 is an infographic, about one-third of the page down. It's titled "Harvest of the Soldiers." And this is also included in other *Dabiq to Rome* newsletters. But what it depicts are statistics related to military successes of ISIS. And then the final page of that exhibit, Your Honor, is again the ATP logo.

Exhibit Number 4, again, another *From Dabiq to Rome* newsletter edition, Issue Number 29. The cover picture appears to be a fighter, likely somewhere in the Middle East, shooting a rocket-propelled grenade. Turn the page to Page 1, you'll see a photograph of what appears to be a fighter. Near the top right-hand corner is the ISIS flag depicted. And then it's -- as with Exhibit 3, this newsletter continues with a number of articles and infographics. On Page 8, again, it begins the News Headline portion of the newsletter. And in particular, Your Honor, on Page 9, at the bottom, there is a headline, "Three American Soldiers are Killed in an Attempted Landing on the Desert of Anbar."

I'm just going to read this summary, Your Honor. It says, "By Allah's grace, the soldiers of the Khilafah succeeded in thwarting an American army landing on the desert of Anbar. The mujahidin lured the crusader force into an ambush as clashes took place during which various types of weapons were used. They managed to kill three crusaders and wound others, forcing the attacking force to evacuate their

casualties and retreat in defeat, and all praise is due to Allah."

Following that, Your Honor, continues with the -- with the News Headlines. The bottom of Page 11 is the -- is another edition of the "Harvest of the Soldiers" which captures the statistics related to ISIS fighting. And, again, the final page is the ATP logo.

Then Exhibit Number 5, Your Honor, very similar to the others, it's Issue Number 30 of *Dabiq to Rome*. Note in particular, Your Honor, Page 3 contains an infographic which at the top includes the ATP logo and is titled, "The Sword is a Must. Jihad is a Must."

Moving on, Your Honor, Page 6 of the exhibit depicts a photograph of ISIS fighters near a vehicle displaying the ISIS flag. Page 7 begins a News Headline portion. And then Pages 8 and Page 9 depict the "Harvest of the Soldiers" infographics related to ISIS's military statistics. Again, Your Honor, this is a newsletter that was published by ATP, the organization that was led by the defendant.

Moving on to Exhibit Number 6, Exhibit Number 6 is a photograph that was taken during the search of the defendant's residence. This is a picture that captures a photograph of currency, and we believe it's about 3300 dollars' worth of cash that was located in an envelope in the defendant's room at the residence.

Okay. So, moving on, Your Honor, Exhibit Number 7. For this one I want to give just a little bit of context for it. I think it will help the Court understand what's going on here. So this defendant is particularly savvy when it comes to the use of the Internet. He's familiar with VPNs. He's familiar with Tor. When he was arrested, he had an app on his tele -- on his cell phone called Orbot, which is an app that is a tool used by Android devices that keeps communications anonymized and hidden.

THE COURT: What is the name of that, Mr. Arrowood?

MR. ARROWOOD: I believe it's Orbot, O-R-B-O-T.

THE COURT: Thank you.

MR. ARROWOOD: And so in light of that, Your Honor, the defendant has utilized a number of encrypted social media applications, and we believe that's in an effort to obfuscate his conduct and otherwise shield it from law enforcement detection.

In this particular case the defendant has utilized the social messaging platform called Telegram. And much of the information in the case comes from the defendant's use of the social media application Telegram. Telegram is an encrypted messaging service, as I mentioned. It does not have any presence here in the United States. Telegram promotes itself by noting that it has a distributed infrastructure which frustrates governmental ability to compel the disclosure

of users' communications through legal process.

On the Telegram website, the Frequently Asked Questions portion, Telegram states, quote, "Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on peoples' privacy and freedom of expression," close quote. It goes on to say, quote, "To this day we have disclosed zero bytes of user data to third parties, including governments," close quote.

The defendant and other members of ATP communicate predominantly through the social media application, as I mentioned, called Telegram. During the investigation the FBI online covert employee was able to gain access to one of ATP's groups on Telegram. The search warrant affidavit that's included as Exhibit 2 refers to this OCE as "FBI OCE 1," and I'll refer to him as "OCE" throughout this particular hearing, Your Honor.

As a member of one of ATP's groups on Telegram, the OCE was able to capture the group communications that had occurred while he was a member -- while he or she was a member of that ATP group on Telegram. And so what you have here in Exhibit 7 is the capture of ATP group Tele- -- communications on Telegram. Again, these were captured by the FBI OCE.

So on this particular exhibit, Exhibit Number 7, Your Honor, I'm just going to orient you, and the defense as well, to what's depicted here. On the left-hand side is the

date. These are the dates of the communications. I believe all of these occurred on or about August 8th of 2019 for this exhibit. What follows from the date is the time, in 24-hour format. So it looks like these began at about 6:44 p.m. and continued after that.

Immediately to the right of the time is a Telegram-generated identification number. You'll see here, Your Honor, that many of those identification numbers are redacted. What's left unredacted is a Telegram-generated number that relates to the defendant's Telegram accounts. So you'll see 129518815 unredacted throughout this exhibit. To the right of that number will be the Telegram user name, which you'll see here, Your Honor, also a number of redactions.

We've redacted out all of the user names associated with the other ATP group members in this exhibit, but we've left unredacted the defendant's Telegram user name, which appears in Arabic script, Your Honor, but it's Abu Hamza Rumi. And we've also left unredacted the content of the communication that occurred during this time name.

So this particular exhibit relates to traveling to Mexico. And in particular what it discusses is the defendant's knowledge of his ability to travel to Mexico to evade what he calls the no-fly list. So here he's discussing with other ATP group members his knowledge of how he could leave the United States without being detected by law

enforcement. So I'm going to go through some of these quotes, Your Honor, sort of highlight what I think are the most important ones.

So it begins at 6:44 p.m. by an ATP group member saying, quote, "So you're telling me you can't leave the U. S. until when?" close quote.

And a few lines down, the defendant says, "On no-fly list."

Several lines down, the defendant says, "Once almost tried to get to the UK. They withheld my passport for over a year. Then it came in the mail."

And a few lines down from that, Your Honor, at 6:48 the defendant says, "But FBI said I'm on a no-fly list and would have been detained."

So beginning at 6:49 p.m. the defendant says, "The no-fly list also extends to Canada, which I found telling. Can't fly out of Canada."

An ATP group member says, "Go to Mexico. Do you think it would be possible if you went to Mexico or Guatemala and flew from there?"

In response, the defendant says, "Naam." Naam means "Yes." "Mexico only option, but then the flight can't even go over America."

So from then on, Your Honor, two different ATP group members debate the risk of the defendant attempting to travel

through Mexico.  And then at the top of -- near the top of Page 2, one of the ATP group members says, "So you can go to Mexico without any problem?"

The defendant says, "Yes."  And then the defendant says, "And Canada.  Just can't fly out of Mexico."

And then a series of confusion proceeds because the defendant essentially meant that he can't fly out of Canada but he can fly out of Mexico.  That's Exhibit 7, Your Honor.

THE COURT:  Just one moment.  I'm making a note.

(Brief pause.)

THE COURT:  Okay.  Go ahead.

MR. ARROWOOD:  Okay, Your Honor.  So with respect to Exhibit 8, again, I want to provide just a little bit of context here.  Earlier I mentioned that the defendant is the leader of ATP.  During the course of the investigation we've uncovered that not only is the defendant the leader but that he also communicates in particular with all -- with most ATP members.

But there is one ATP member in particular that was -- that had a large role in the conduct of ATP.  That particular ATP member's name is Radwan Dekkak.  And Mr. Dekkak is an Australian.  He and the defendant communicated regularly through Telegram.  We believe they were very close.  And what's depicted in Exhibit 8 is a number of handwritten letters that we believe were mailed from Mr. Dekkak in

Australia to the defendant here in Knoxville, Tennessee. Note that each of these envelopes as depicted in this photograph identifies the recipient of the letter as Abu Hamza and also includes the defendant's premises address on those letters.

One thing also to note, Your Honor, that when these letters were sent, Mr. Dekkak was in prison. On July 2nd of 2019, Australian authorities arrested Mr. Dekkak on terrorism-related charges. He was an active member of ATP, as I mentioned. Based on a review of the ATP group communications, the defendant sent most messages but Mr. Dekkak sent the second-most number of messages. And here you can tell, Your Honor, that they exchanged letters frequently while Mr. Dekkak was in prison.

I think that informs what's going on in Exhibit Number 9, Your Honor. So in Exhibit Number 9, again, you have Telegram communications --

THE COURT: Mr. Arrowood --

MR. ARROWOOD: I'm sorry.

THE COURT: -- I'm sorry, before you move to Exhibit 9, on Exhibit 8, just because I'm looking at this photocopy, can you generally provide me the date timeframe for these? I know you said it was while Mr. Dekkak was in prison, but I'm just wondering if the date appears anywhere on this copy.

MR. ARROWOOD: Your Honor, I can't -- I think the

answer is, yes, the dates are on here. The problem is that I can't read the dates on here very well.

THE COURT: Okay.

MR. ARROWOOD: We can certainly get those dates for the Court. I will say in sum, though, that these letters were sent from Mr. Dekkak while he was in prison, which did not begin until July of 2019.

THE COURT: Okay.

MR. ARROWOOD: So at some point between July of 2019 and the present, or at least at the time of the execution of the arrest on the 23rd -- or, I'm sorry, 24th, these letters were received by the defendant.

THE COURT: Okay. That's helpful. Thank you.

MR. ARROWOOD: So, again, on the subject of Mr. Dekkak, Your Honor, moving on to Exhibit Number 9, what's depicted in Exhibit Number 9 is a series of communications in ATP's group on Telegram which were captured by the OCE. This group of communications occurred on December 29th of 2020. Unfortunately, Your Honor, the pages are not numbered, so I'm going to refer to it by the -- by times, in terms of addressing some particular communications contained in this exhibit.

But overall, Your Honor, what's going on in this exhibit are communications between the defendant and other ATP members anticipating Mr. Dekkak's release from prison. So Mr. Dekkak was set to be released from prison and, much like

here in the United States, the court in Australia was set to impose certain conditions on Mr. Dekkak's release. And in Australia they call this a control order. Here obviously it's called supervised release. But this is a discussion between the defendant and other ATP group members about what to do about Mr. Dekkak being on a control order upon his release.

So what you have, Your Honor, at the bottom of the first page, ATP group member——I believe it's the defendant——writes, "Radwan," meaning Mr. Dekkak, "three days in Shalah."

And then the defendant, through his Telegram account, posts a GIF image of two individuals, two -- appears to be two fighters shaking hands.

Now I'm going to skip over a number of these communications, Your Honor, but, again, they're all talking about Mr. Dekkak leaving prison, having a control order in place, and how they may or may not be able to communicate with Mr. Dekkak, in contravention of the Australia court's order through the control order.

So I believe it's on Page 3, Your Honor, the time would be about 8:53:03 a.m., one ATP member writes, "If you do, he has broken his control order," in reference to sending messages to Mr. Dekkak upon his release.

The defendant, through the use of his Telegram account, writes, quote, "Don't get caught."

Moving down further to the bottom of that page, another ATP group member writes, "A brother just got locked up a second time for breaking his control again for a second time."

Top of the next page, at 8:55:14 a.m. the defendant writes, "How'd he get caught?"

What ensues there is some discussion about how that person may have gotten caught. But at 8:57:08 a.m., towards the bottom of that page, the defendant writes, "Bro, how would they know? He used his mom's phone."

What ensues there is further discussion about that other individual who apparently violated his control order. And then at 9:00:10 a.m., when talking about how to communicate with Mr. Dekkak, the defendant writes, "TG and Signal should be good."

We believe "TG" is Telegram, because it has encrypted messaging applications; so is Signal. So here the defendant is advising Telegram and Signal should be good, should be able to be utilized to communicate with Mr. Dekkak even though he would have a control order in place upon his release.

What follows, again, are subsequent discussions by other ATP members about the possible specifics of the conditions related to Mr. Dekkak's release. This goes on for several pages, Your Honor. I'm going to skip over most of

those till we get to the page where the first communication at the top is at 9:18:16 in the morning. So here again we're talking -- the ATP members are talking about communicating with Mr. Dekkak while he's on -- under a control order. And then at 9:20:11 a.m. an ATP member writes, quote, "Best to leave it, then, Akh," Akh being "Brother."

The defendant writes, quote, "Leave it to me."

Further communications ensue. And then, Your Honor, at 9:22:56 the defendant writes, "I don't know what Radwan's going to do."

At 9:23:34 he writes, "Haha, I'll find a way."

Further communications begin to ensue with respect to Mr. Dekkak's control order. Then 9:28:02 an ATP group member writes, "My name won't be there," meaning won't be included on the control order, "because I don't have a definite alias."

The defendant responds at 9:28:14 saying, "Nice. If Abu Hamza is there, I'll just pop up as our akh," and then it's redacted. Here he's saying if his alias is there, he'll just pop up as another person. And then there at the bottom, at 9:29:03 a.m. the defendant posts a GIF image of a -- what appears to be a young girl in front of an ISIS flag.

Your Honor, that's the most relevant portion of Exhibit 9.

THE COURT: Okay.

MR. ARROWOOD: Exhibit Number 10. Throughout the course of the defendant's conduct, and in particular his leadership role within ATP, the defendant has come into contact with and communicated with a number of other individuals, either within ATP or outside of ATP, who have been arrested on terrorism-related offenses. Some of those offenses involve planning attacks in the United States and abroad.

So what follows now are a series of news articles and press releases related to some of those individuals, again that are connected to the defendant. So with respect to Exhibit Number 10, this is a press release issued by the Department of Justice, by the U. S. Attorney's Office in the Northern District of Illinois, on September 20th, 2016, announcing sentences for two individuals. These are cousins, Mr. Hasan Edmonds and Mr. Jonas Edmonds.

As reflected in Exhibit 2, Your Honor, which goes into this in some more detail, in March 2015, in the Northern District of Illinois, the FBI arrested Hasan and Jonas Edmonds for conspiring to provide material support to ISIS. Prior to their arrest, an FBI undercover employee met with Jonas. Jonas told the undercover employee that, quote, "Abu Hamza was someone who could help plan an attack."

On the day after the meeting between Jonas and the undercover, Jonas informed the undercover that he discussed the attack with Abu Hamza as a potential supporter but that

Abu Hamza was not going to be able to help with the attack due to a propaganda war Abu Hamza engaged in. Jonas also told the undercover that Abu Hamza asked him to film the -- his attack on the military facility in Illinois and to provide the footage to Abu Hamza so that Abu Hamza could publish it online. Jonas added that Abu Hamza was known for posting ISIS videos online, and had a connection to, quote, "bros on the side," end quote, which agents assessed to mean overseas ISIS members.

Jonas also described Abu Hamza as a webmaster. And according to Jonas, Abu Hamza told him that if he got Abu Hamza the footage, Abu Hamza could get the footage to them. Based on discussions with other agents, it's likely that "them" referred to overseas ISIS members.

That's, again, depicted in further detail in Exhibit 2, an unredacted portion of the search warrant affidavit.

Moving on to Exhibit Number 11.

THE COURT: Mr. Arrowood, just one moment. Let me check in with the court reporter.

Is the speed with which this is being presented okay for you to be able to get everything?

THE COURT REPORTER: Yes, ma'am. Thank you.

THE COURT: Okay.

All right. I'm sorry, Mr. Arrowood. I just wanted

to check in and make sure.

MR. ARROWOOD: That's fine, Your Honor.

THE COURT: And you may proceed.

MR. ARROWOOD: So, Your Honor, proceeding in a similar vein, Exhibit Number 11 is a -- is an announcement by the Treasure Department whereby the Treasury Department is identifying a number of individuals and entities that it is -- it is designating as specially designated global terrorists.

In particular, Your Honor, what's relevant in this particular exhibit is -- occurs on Page 8. The first pages are not relevant to this defendant, but on Page 8 it discusses an individual named Mohamad Ameen, A-M-E-E-N. Mr. Ameen was designated by the Treasure Department, according to this press release, largely because of his role as a recruiter for ISIS in the Khorasan Province.

The investigation of the defendant has revealed that the defendant and Mr. Ameen have been in regular communications on ATP -- through ATP group on Telegram, as captured by the FBI online covert employee.

Related to Mr. Ameen is Exhibit Number 12. This is a news article about Mr. Ameen's arrest. Mr. Ameen is a Maldivian. He was arrested in the Maldives. And on Page 2 of this news article it indicates that Mr. Ameen was arrested on suspicion of spreading an extremist ideology. And then further down in that news article it states that he's also

suspected of involvement in an explosion at the Sultan Park in the capital of Malé in September 2007.

Exhibit Number 13. Your Honor, the -- the FBI investigation into the defendant has revealed that an individual by the name of Awais, A-W-A-I-S, last name Chudhary, C-H-U-D-H-A-R-Y, was also a member of the ATP Telegram group and frequently interacted with the defendant and other ATP members. What's depicted in Exhibit Number 13 is a press release by the Department of Justice, particularly from the Eastern District of New York, on August 30th, 2019, announcing the arrest of Mr. Chudhary. Per this particular release, it indicates that Chudhary was arrested and charged with attempting to provide material support to ISIS based on his conduct in preparation for an attack in New York.

Your Honor, I'll note here that this case has not been adjudicated, it is still pending. And I don't know when the trial is set to occur, Your Honor, but it's just important for the Court to understand he has not yet been convicted of this offense.

THE COURT: All right.

MR. ARROWOOD: Moving on to Exhibit Number 14, in a similar vein, the investigation has revealed that a United Kingdom-based individual named Nuh Raheel, N-U-H, last name R-A-H-E-E-L, was also a regular participant in the ATP Telegram group. As indicated in Exhibit Number 14, in October 2020,

Mr. Raheel was arrested by British authorities and charged with seven counts of possession of articles for terrorist purposes. According to this article, Raheel possessed instructions on hostage-taking, vehicle attacks, arson, and knife attacks.

Okay. Exhibits Number 15, 16, 17, 18, and, I believe, 19 were all obtained pursuant to a search warrant for the defendant's Google accounts. What these are are documents that were in the defendant's possession, according to that search warrant, and we believe pertain specifically to some of the issues that the Court is going to think about in terms of addressing detention. So I'm going to go over those briefly for the Court.

Exhibit Number 15 is a document, the title of which is "The Issue of Beheading." This is a 16-page document. I believe I've provided the Court and defense, in the binder, with the full 16 pages of this particular exhibit. And just -- what this document does is, it justifies beheading in particular. And on Page 3 of the document, I think it's actually probably the fifth page but the third page of writing, about two-thirds of the way down, it, quote, "As for beheading, the disbelieving Jews, Christians, Nusaiyris, the apostate Rawafid who do what they do to the Muslims, it is obligatory to terrorize them and grow fear in their hearts. So their heads can be cut off with no respect. Decapitating the heads is a Sunnah of the Shabah --" or "Sahabah," sorry,

"may Allah be pleased with them all," end quote. Again, the Court has the full document if it wishes to review it.

Document 16 -- I'm sorry, Exhibit Number 16 is a 60-page document. We've not provided in the exhibit binder the full 60 pages, but it is provided on the disk in its entirety for the Court. This particular document, as the title suggests, is "The Islamic Ruling on the Permissibility of Self-Sacrificial Operations." Of course the document justifies the use of self-sacrificial operations in certain contexts.

Exhibit Number 17 is a 39-page document. Again, we've not provided the full document to the Court and to the defendant in the binder, but we have provided it on the disk. This exhibit is titled, "A Treatise on the Legal Status of Using Weapons of Mass Destruction Against Infidels."

One thing that's notable here, Your Honor, is, the author of this news article -- or this article is Nasir bin Hamad Al-Fahd, as depicted on the -- on the front page there of Exhibit Number 17. During the post-arrest interview of the defendant, the defendant identified Nasir bin Hamad Al-Fahd as one of the Islamic individuals that he follows in particular as it relates to ISIS ideology.

Exhibit Number 18, Your Honor, this one is three pages long. I believe I have provided the whole document to the Court and to the defendant. It's titled "Ruling on

Fighting Americans Outside of Iraq." Note here, Your Honor, that the author of this -- of this document is the same as the one previously, that the defendant has identified as being someone that he follows in particular. And on the top of the second page, Your Honor, I'll just also read a small quote. "So doing jihad against those cursed ones, and awaiting for them, and fighting them wherever they may be is from the most important of obligations, and the greatest of things that can bring you close to Allah."

It goes on, at the bottom of that paragraph, to say, "If I had ten spears only, I would have thrown it all at them and no one else except them, and I swear by Allah if my chance to do a martyrdom operation against them becomes easy, I will do it without any hesitance whatsoever," close quote.

Moving on, Your Honor, Exhibit Number 13, again, a document that was found in the defendant's Google accounts, we've not provided the whole document --

THE COURT: This is Exhibit 19, correct?

MR. ARROWOOD: Yes. Yes, Your Honor. We've not provided the whole document --

THE COURT: I'm sorry. You --

MR. ARROWOOD: I'm sorry.

THE COURT: That's okay. You had said "Exhibit 13." So I just wanted to make sure --

MR. ARROWOOD: I'm sorry.

THE COURT:  -- we were going forward with Exhibit 19. Okay.

MR. ARROWOOD:  Yes, Exhibit 19, Your Honor.  For this particular document, we've not provided it in the exhibit binder in -- all the pages of it, but we provide it on the desk.  The title of this document, "The Clarification Regarding Intentionally Targeting Women and Children."

Moving on, Your Honor, we also provided the Court, on the disk, Exhibits 20 and 21.  These exhibits are videos.  Both of the videos -- both the video depicted in Exhibit 20 and in Exhibit 21 were found in the defendant's Google accounts pursuant to the search warrant executed on the defendant's Google accounts.  Your Honor, I don't anticipate showing them here today, but the Court has them and certainly can review them, and they're on the disk.

But Exhibit Number 20 is a video titled *For the Sake of Allah*.  It is about a three-minute video.  It was published by an organization called Al-Hayat.  Al-Hayat has been added by the State Department to the designation of ISIS as a component of ISIS's official media.  This particular video glorifies ISIS by depicting near-constant battle footage in the Middle East, including explosions, shootings, et cetera. In one brief clip it shows what appears to be an ISIS fighter climbing onto a U. S.-made tank, dropping what appears to be an explosive device into the top hatch, and the subsequent

explosion.

Within the video, Your Honor, there's a refrain that they -- that keeps getting repeated, and it's, quote, "For the sake of Allah, we will march to the gates of the paradise where our maidens await. We are men that love death just as you love your life. We are the soldiers that fight in the day and the night," close quote.

Exhibit 21, again also a video that was located in the defendant's Google accounts, is called *The Rank*. This video is about 4 minutes and 40 second -- 40 seconds long. This video is in Arabic but has English subtitles. It does appear that the ATP logo is flashed at the beginning of the video and thereafter is depicted in the top right-hand corner of the video throughout. So we believe, based on that, that this is a video that was translated by ATP, the organization led by the defendant. In this video it depicts ISIS imagery, including ISIS fighters, shows battle footage, explosions, and injured children. It's interspersed with clips of leaders from various western countries as well.

Your Honor, Exhibit 22. Exhibit 22 is a series of communications that was collected by the FBI OCE who was within ATP's group on Telegram. This particular snapshot of communications occurred on October 16th of 2020, and what's depicted on the first page is an ATP group member posting a news article about a terrorist attack which occurred in Paris.

The defendant responds on Page 2 with a GIF image of what appears to be some small animal praying. Afterwards there's a graphic photograph of what appears to be the victim of that attack, in the middle of Page 2.

At the top of Page 3, the defendant, 2:48:14, writes, quote, "Just after having beheaded, he posted a picture of the teacher on Twitter with this commentary, quote, 'In the name of Allah, the most merciful, the merciful, from Abdullah, the servant of Allah, to Macron, the leader of the infidels, I have executed one of your dogs of hellfire who dared to belittle Muhammad. Keep your likes calm before we inflict you a harsh punishment," close quote.

The defendant also indicates that the perpetrator is 18 years old, and says, "From an akh in France," meaning, "From a brother in France."

An ATP group member responds at 2:49:40, stating, "The brother," meaning the perpetrator of the attack, "was shot dead."

The defendant responds by saying, "May Allah have mercy on him and unite him with the Nabi."

Again, Your Honor, they're talking about the perpetrator of that attack, not the victim of the attack.

Exhibit Number 23. This is also a series of communications captured by the FBI online covert employee in the ATP group on Telegram. This is a fairly short series of

communications, but it begins with the defendant posting what appears to be a photograph. It also appears to be taken from the Amazon.com website, about a paperback book titled *U. S. Army Improvised Munitions Handbook*. He also shows the picture of the back of the book, and also depicts one of the reviews of the book.

One ATP group member later on says, "Buy it and upload the pdf for us."

And on the last page of that exhibit the defendant posts a photograph of two individuals shaking hands.

Then Exhibit Number 24. This is also a series of communications within ATP group on Telegram that was captured by the FBI OCE. This series of communications occurred on December 25th of 2020. Begins at the bottom of the page where the defendant posts a news article related to the bombing which occurred in Nashville, Tennessee. There on the second page the defendant responds to his own post by posting a picture of a Middle Eastern man smiling.

Someone responds, "Blasted the gas pipe between Israel and the Saina."

And the defendant writes, "Alhamdulillah. Good."

That's Exhibit 24.

Your Honor, that concludes all the exhibits that were contained in the binder that we provided the Court and for the defendant. After the government provided this

material to the Court and to the defendant, the government reviewed the amended pretrial services report that was authored by the probation office. We'd also ask that that document be included as Exhibit Number 25 to this hearing. I have not provided a copy with the Court. I suspect the Court has a copy of it already, Your Honor. But we just wanted to make sure that gets entered into -- entered as an exhibit during this hearing as well.

THE COURT: All right. That will be Exhibit 25.

MR. ARROWOOD: So, Your Honor, that concludes the exhibits that the government's going to be relying on. I'm happy to address any concerns the Court has with respect to how the government believes any one of them is relevant to the issues before the Court today. I think, for many of them, they are somewhat self-explanatory. But at this time, Your Honor, the government does move to admit, for purposes of this hearing only, Government's Exhibits 1 through 25.

THE COURT: All right. If you could just go to 24 and give me the date again. I see the times, but I failed to make a notation of the date.

MR. ARROWOOD: Yes, Your Honor.

THE COURT: This is the Nashville bombing?

MR. ARROWOOD: Yes, Your Honor. This -- these communications occurred on December 25th of 2020.

THE COURT: All right. Thank you.

All right.  Mr. Sharp?

MR. SHARP:  Yes, Your Honor.  Just the same standing objection to relevance on a lot of those issues.  I don't believe that a lot of those conversations or newsletters were directly attributed to Mr. Carpenter.  I would just ask the Court to give the appropriate weight to them.

THE COURT:  So do you just want the objection to be as to the entirety of--  I just want to give you the opportunity to address any of the specific ones if you -- if you wish at this time.

MR. SHARP:  Thank you, Your Honor.  I would offer an objection to Exhibits 3, 4, and 5, the -- the newsletter, the *Dabiq to Rome*.  There wasn't -- there didn't seem to be any reference to Mr. Carpenter as the author of those newsletters; although, I know there is the allegation that they are on ATP and he is the founder and/or leader of that -- that organization.  But it doesn't appear to me that he was attributed to being the author of those newsletters.

In regard to Exhibit 6, I would just ask the Court to take into consideration that $3300 is not a substantial sum of money, and that Mr. Carpenter had recently gotten stimulus payment from the government due to COVID relief.

In regard to Exhibit 3, it appears that the -- the letter from Australiu -- Australia that were sent to Mr. Carpenter's residence were all written during the time

that the individual in question was in prison, and it doesn't appear that they had other written communications during periods of time when he was not incarcerated.

In regard to Exhibit 10, I would just note for the Court that that was six years ago, in 2015, that Mr. Carpenter was investigated by the FBI in regard -- in relation to that investigation, and he was not charged.

And the same with Exhibit 13, Your Honor. I don't believe that there was any allegation that Mr. Carpenter was involved in either Exhibit 13 or Exhibit 14.

In regards to Exhibits 15, 16, 17, 18, and 19, those are -- are writings that are available online on the Internet, and that those should be protected under free speech. Even if the group of individuals would find them offensive, certainly it would be covered under the First Amendment, same for Exhibits 20 and 21, Your Honor, and that would be the extent of the objection.

Well, I would object to 22, 23, and 24 as well. Again, some of the information in those screen shots could be objectionable, but none of them are inherently illegal.

THE COURT: All right. Thank you. The Court will take that into consideration.

All right. So, Mr. Arrowood, you have completed your proffer, and we've gone through the objections. So is there anything further before I allow Mr. Sharp to put on his

proof?

MR. ARROWOOD: Yes, Your Honor, briefly. There's a couple more points that I'd like to proffer that aren't contained in the exhibits, for the Court's consideration.

THE COURT: Okay.

MR. ARROWOOD: All right. Point Number 1, within the past year Carpenter has communicated with other people wishing to travel overseas to join ISIS. Furthermore, Carpenter told at least one individual that the FBI was likely aware of him or her and in order to avoid being stopped he or she should travel through Mexico rather than through the United States or Canada.

Point Number 2, Your Honor, is that previously the defendant's mother, Denise Carpenter, was employed by the University of Tennessee in Knoxville. As part of her employment, the University of Tennessee provided a laptop computer to his mother. In October of 2019 the University of Tennessee in Knoxville voluntarily provided an image of this laptop to the FBI. Upon review of the image, agents located a document authored and edited by Abu Hamza that was created in November of 2017. This particular article was published on ATP's blog site and was referenced in ATP's newsletter *From Dabiq to Rome*, Issue Number 1. Further review of that image also showed log-in activity from the user named Ben Carpenter, including two different e-mail accounts that are known to be associated with the defendant.

And then finally, Your Honor, Point Number 3, in a case of this nature that involves terrorism, the U. S. Attorney's Office must obtain approval through various components within the Department of Justice in Washington, D.C., before bringing this particular charge. So I'll note here that the indictment alleges the defendant's conduct concluded on or about February 14th of 2021. The United States Attorney's Office sought approval to charge the defendant on February 16th of 2021. The U. S. Attorney's Office obtained approval to charge the defendant on March 22nd, 2021. And the defendant was indicted the very next day, on March 23rd, and was arrested on the morning of March 24th. With that, Your Honor, there's no further proffer from the government. Thank you.

THE COURT: Thank you, Mr. Arrowood.

All right. Mr. Sharp?

MR. SHARP: Thank you, Your Honor.

Your Honor, as the Court's aware, I am requesting that the Court release Mr. Carpenter under a third-party custodian, that being his mother Denise Carpenter. And I would like to call her as a witness.

THE COURT: All right.

Ms. Carpenter, you can certainly remain seated, but if you would please raise your right hand and listen for the oath to be administered.

(The witness was duly sworn.)

THE COURT: Thank you. You may rest your hand.

And, Mr. Sharp, you can proceed.

MR. SHARP: Thank you.

DENISE CARPENTER,

called as a witness at the instance of the defense, having been first duly sworn, was examined, and testified as follows:

DIRECT EXAMINATION

BY MR. SHARP:

Q        Will you state your name, please, for the record.

A        Denise Carpenter.

Q        Okay. And, Ms. Carpenter, I'm going to ask you just to speak up a little bit. It may be my speakers, but I want to make sure that the court reporter can hear you. Okay?

A        Okay. I'll get closer, too.

Q        Okay. Thank you. And, Ms. Carpenter, where do you live?

A        I live here in Knoxville. The address is xxxx xxxxxx xxxx.

Q        And who do you live with?

A        I live with Benjamin Carpenter.

Q        Okay. And are you employed currently?

A        I am not. I retired from the University of Tennessee a year and a half ago or so.

Q        Okay. And do you spend the majority of your time at

home?

A          I do, yes.

Q          And does anybody else live in that home?

A          No, sir.

Q          Okay.  And what does a typical day look like for you when you are home with Benjamin?

A          Um, we -- well, typical day is -- he's on the computer or he's reading.  He and I eat meals together, which he usually will fix in the evening.  We sit on the porch, with the nice weather.  It's -- we just -- typical.  He doesn't go anywhere except to his pet care clients, which is his job, and he'll have maybe three or four of those a week he drives to and either walks dogs or feeds the cats.  And then it's -- it's very quiet.  We watch YouTube videos on camping and hiking.

Q          Okay.

A          And that's about all.

Q          Does Benjamin have a lot of friends that visit or come to the home?

A          No, not at all.

Q          And are you aware if he goes anywhere to visit with other people?

A          No.  He doesn't, um, no, huh-uh.

Q          Now, Ms. Carpenter, do you have any firearms in your home?

A          No.

Q          Okay.  Do you keep alcohol in the house?

A          I'm sorry?

Q          Do you keep alcohol in the house?

A          I do.  Benjamin does not imbibe, but I do.

Q          And --

THE COURT:  I'm sorry, Mr. Sharp, I didn't hear her full response.

BY MR. SHARP:

Q          Can you repeat that for me, Ms. Carpenter?

A          I said there's alcohol in the house, and I -- it's for me, and Ben does not drink alcohol.

THE COURT:  Thank you.

THE WITNESS:  Yes.

BY MR. SHARP:

Q          Thank you, Ms. Carpenter.  Now, I have talked to you about, if the Court were to allow Mr. Carpenter to come home and stay with you until his case is resolved, whether or not you'd be willing to be a third-party custodian, correct?

A          Yes, you have.

Q          Okay.  And in those discussions I've told you that if the Court were to allow him release, that he would be put under conditions to allow him to remain out and at your home.

A          That's correct.

Q          And if he were to violate any of those conditions,

that you would have an affirmative obligation to let the Court know that he has in fact violated those conditions.

A        Yes.  Yes.

Q        And are you willing to tell the Court that you would take on that responsibility, knowing that if you do make that call there's a chance that Ben would be incarcerated again?

A        Yes.  Absolutely.

Q        And in fact you've had experience with this with your younger son several years ago?

A        Um, I did.  When the younger son was in juvenile court, he had substance abuse issues, and he was placed under house arrest, and he broke those rules, and I did call.

Q        And you did report your younger son?

A        I did, yes.

Q        Now, you've been here during the entirety of this hearing, correct?

A        Yes.  Yes.

Q        The allegations against Benjamin deal with primarily Internet use; there are some letters, but primarily Internet use.  Do you have Internet in your home?

A        I do.

Q        I would suspect that any condition that the Court would consider would require having the Internet removed from the home.  Is that something that you are willing to do?

A        Yes, I would do that.  I have checked with the

provider and know that I can have it suspended with just a call to them, yes.

Q        Okay.  And that's through AT&T.  Is that correct?

A        That's correct.

Q        What about -- who do you have your cell phone contract with, Ms. Carpenter?

A        Cell phone is AT&T as well.

Q        Okay.  And you know smartphones now are essentially little pocket computers?

A        Yes, they're computers, yes, uh-huh.

Q        Could you make sure that Benjamin didn't have access to smartphones while staying in your home?

A        I certainly would do that, yes.

Q        And the Court may require him to be on home electronic monitor -- monitoring to make sure that he's not leaving the house.  Is that something that you would be willing to have in your home?

A        Yes.

Q        It's -- essentially it's an ankle monitor system.

A        Yeah, mm-hmm, I understand that.

Q        Now, the Court -- if the Court were to consider letting him out, they may require that he keep his employment.  Would you be willing to help him with transportation to and from his employment?

A        I would do that.  As I say, I'm -- I'm free all --

all day.  I can drive him to his -- yes, I can drive him.

Q        And I know I think you said that Benjamin doesn't drink or do drugs.  If you witnessed that behavior, though, would you be willing to call his pretrial services officer?

A        I would.  It would surprise the heck out of me if I ever saw him do it, take a drink, but, yes, I would if it's...

Q        And I'd like to ask you this, Ms. Carpenter.  This came up earlier.  Do you -- do you get the mail at the house, or do you get it at the post office?

A        Here at the house.

Q        If the Court were to require it, could you temporarily receive your mail at the post office and have a key to that that Mr. Carpenter would not have, or could you put it to make sure that he's not getting any physical mail during this period of pretrial release?

A        I'd be willing to have a post office box, yes.

Q        I know that could be a little problematic or -- logistically speaking, but that may be an issue the government argues, is that he's --

A        Well, yes.

Q        -- corresponding through written letters as well.

A        Right.

Q        Yeah.  Would you be willing to help put safeguards in place to prevent that?

A        Yes.  I'm willing, yes.

Q        To your knowledge, has Benjamin ever left the country?

A        No, he has not.

Q        And I believe the FBI seized his passport, correct?

A        I -- yes, they did, yes.

MR. SHARP:  All right.  I believe that's all the questions I have for you, Ms. Carpenter.  The government may have some questions.

THE WITNESS:  Sure.

THE COURT:  Mr. Arrowood?

MR. ARROWOOD:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ARROWOOD:

Q        Good afternoon, Ms. Carpenter.

A        Good afternoon.

Q        My name is Casey Arrowood.  I'm an attorney for the government.  I'm the prosecutor on this case.  I -- I understand you've been proposed to be a third-party custodian for your son.  And the Court will make the ultimate determination as to whether or not your son should be released and whether or not you're an appropriate third-party custodian.  But I suspect the Court's going to ask me what I -- what the government's view is, and so I need to ask you a few questions.

A        Sure.

Q        I hope that's okay.

A        Yes.

Q        I certainly don't mean to pry or -- or to be invasive.  It's just to get some facts so that I can understand what the situation is --

A        All right.

Q        -- or would be for him were he to be released.

A        All right.

Q        Okay.  So talk just a bit about -- about your home. How big is your house?

A        Um, 1300 square feet.

Q        And how many bedrooms does it have?

A        Three bedrooms.

Q        Now, do you live in a neighborhood?

A        Yes, I do.

Q        Is -- is there a house -- let's say you're -- you're facing the front door of your house --

A        Mm-hmm.

Q        -- is there a house to the right of your house?

A        Yes.

Q        Is there a house to the left of your house?

A        Yes.

Q        Is there a house across the street from your house?

A        Yes.

Q        And is there a house behind your house?

A        Uh, yes.

Q        In terms of the houses to the left and right of your house --

A        Mm-hmm.

Q        -- approximately how far away are they from your home?

A        Uh, what would you say, Robert?  They're --

MR. SHARP:  Denise, I'm sorry, you can't -- I'm sorry --

THE WITNESS:  I can't --

MR. SHARP:  -- I can call Robert as a witness, but you can't ask Robert.  I'm sorry.

THE WITNESS:  I'm sorry.  He can determine distance a lot easier than I can.

We're not crammed up against each other, but we're not -- you know, it's a driveway and a yard in between our houses.

BY MR. ARROWOOD:

Q        Okay.  Understood.  All right.  So earlier you mentioned there were three bedrooms in your house.

A        Yes.

Q        Are all three on one floor of the house?

A        Yes, they are.

Q        Are they on the second floor, or the first floor?

A          Actually I have three levels --

Q          Okay.

A          -- the downstairs level being den and laundry, the middle level being the living room and kitchen, and then the top level is the three bedrooms and a bath.

Q          And I believe you mentioned it's just you and your son living there currently.  Is that correct?

A          That is correct, mm-hmm.

Q          So the third bedroom is vacant?

A          Correct.

Q          Okay.

A          Kind of a guest room, office.

Q          Sure.  And how far away from the defendant's room is your room?

A          Across the hall.

Q          Okay.  Okay.  So for how long has -- has your son Benjamin been living with you?

A          He has been here for two years, maybe just a -- two and a half years, maybe.

Q          Okay.  And I believe it's been mentioned earlier during the hearing, but does he have a job?

A          He does.  He works for a -- for Waggy Tails Pet Care, Pet Sitting, which is a part-time service where he -- he would go to a client's house if they needed dog walking or cat care.  He does not stay overnight.  He's not a -- he doesn't

stay overnight at clients' house.  He just does daily care.

Q       Okay.  Approximately how many hours a week would you say he works at this part-time job?

A       Um, no more than ten.

Q       Now, since you've been living with -- with your son for the last couple of years, how does he spend most of his time?

A       On the Internet or reading.

Q       Okay.  To your knowledge, did -- can your son read Arabic?

A       I -- yes, he can.

Q       Do you know if he can write in Arabic?

A       I -- yes, I feel sure he can.

Q       And can -- can he speak and understand Arabic?

A       I assume so.

Q       Okay.  So earlier you mentioned that you have a cell phone.  Is that correct?

A       Correct.

Q       And did you just recently get that cell phone?

A       Well, this specific one, I did, because we've changed carriers --

Q       When did you --

A       -- so I got a new phone.

Q       I'm sorry?  Can you say that one more time, ma'am?  I'm sorry.

A      I'm sorry.  We changed carriers, so -- just, like, two weeks ago, and I -- and so I did get a new phone then. But I of course have had a smartphone for a number of years.

Q      And who is your cell phone service provider now?

A      AT&T.

Q      Now, when you signed up for AT&T service a couple weeks ago, did you have to sign a commitment to stay with them for a certain period of time?

A      No, I didn't.

Q      Okay.  And now that you've had this cell phone for -- for a couple weeks, do you get cell service at your home?

A      Yes.

Q      Okay.  All right.  Now, I know you were present for this hearing before.  I mentioned to the Court that there was evidence that the government's obtained in the case that indicates that -- that your son has in the past used your devices and in particular a laptop computer that was provided to you by the University of Tennessee in Knoxville.  Were you aware that your son was using that device?

A      I--  That was some years ago, I believe, that you mentioned, and I don't recall -- I don't -- I don't think I was aware that he was using that computer, because it didn't belong to the university -- or it did.

Q      Ms. Carpenter, do you have a vehicle?

A       I'm sorry?

Q       I'm sorry.  Do you have a vehicle?

A       Yes, I do.

Q       And has your son ever used that vehicle?

A       Yes.

Q       To your knowledge, does your son have a bank account?

A       No.

Q       Now, one of the government's allegations in the case is that your son uses an alias named Abu Hamza.  Are you familiar with Abu Hamza?

A       I -- I am somewhat.  I had seen it written on -- you know, on some -- something, and I asked if it was him, and verified that was his Arabic name or something.

Q       Okay.  Earlier you mentioned that he's been in your house -- I think you said for two or two and a half years.

A       Mm-hmm.

Q       Where did he live before he moved in with you?

A       He was living in Blacksburg, Virginia.

Q       Was he living on his own at that time, or was he living with someone else?

A       He was living with a girlfriend and her children.

Q       Do you happen to know why he decided to move to your house in Tennessee?

A       They broke up, and he asked if he could come here,

with the idea that probably he would be living with his dad at some point in time, because they were planning to live together.  Ben has lived with him previously some years ago.  So did that answer the question?  I --

Q          I think so, yeah.

A          Okay.

Q          Were you aware that -- that your son has a -- I'll say "friend," and -- and maybe it's more of a connection or acquaintance but at least someone he's in contact with in Australia?

A          I -- I did know about the -- yes, I knew about letters from a prisoner.

Q          So you knew that that Australian had been in prison?

A          Yes.  That-- Yes.  The address is on the envelopes and -- yeah.  So I asked Ben about -- about it, and he verified, yes, he was in -- he was in prison in Australia, mm-hmm.

Q          Did he tell you why --

A          No.

Q          -- the Australian had been arrested?

A          No, he didn't, but I didn't ask as well.

Q          Okay.  Just a couple more questions for you.  I'm sorry.  One second.  Were you aware that in -- in 2015, I believe it was May 2015, were you aware that the FBI conducted a search at your son's residence in Virginia?

A          Yes.

Q          Did that concern you?

A          Yes.

Q          And now that you've had some time since -- since your son's arrest a couple weeks ago, did the FBI's arrest of your son surprise you?

A          It shocked me.  So I was surprised on -- in that regard.  I will say that because he is -- he is Muslim and we are in East Tennessee, as a mom I guess I kind of live with a little fear, because, yes, I do know he's on the Internet. I'm not aware of anything he was doing that would be -- that would get him into trouble or anything with the federal government, but, you know, it's just kind of a weird thing, you know, to have the FBI come here and tell me he was arrested, but something that I -- has occurred to me before, just given the climate.

Q          I see.  Is -- is Ben Carpenter your only son?

A          Uh, no.  I have another son, younger, two years younger than Ben.

Q          I think you mentioned him earlier.  Is his name Matthew?

A          Correct.

Q          Is Matthew also a Muslim?

A          Yes, he is.

Q          And has he ever been interviewed by the FBI, to your

knowledge?

A       No.

Q       Has the FBI ever searched his house, to your knowledge?

A       No.

        MR. ARROWOOD:  Okay.  All right.  Thank you, Ms. Carpenter.  I certainly appreciate you answering my questions.

        That's all, Your Honor.  Thank you.

        THE COURT:  Mr. Sharp, do you have any redirect for her?

        MR. SHARP:  Just very briefly, Your Honor, just to kind of clean up a little bit here on one issue.

                        REDIRECT EXAMINATION

BY MR. SHARP:

Q       Ms. Carpenter, I think you said that you were shocked that Benjamin was arrested by the FBI, correct?

A       Correct.

Q       However, you knew that the FBI had questioned him on at least one other occasion?

A       Yes.

Q       So it didn't come completely out of the blue even though it shocked you when it happened?

A       Yes.

        MR. SHARP:  I -- I believe those are all the

questions I have, Your Honor.

THE COURT: The Court may have some questions, Ms. Carpenter.

THE WITNESS: All right.

THE COURT: Ms. Carpenter, how long has he been employed with -- I believe you said it was Waggy Tails.

THE WITNESS: Um, a year. Probably a little over a year.

THE COURT: Okay. And I was just a little confused about this point, but when you were asked about him moving to Tennessee, you said there was some discussion about him living with his father?

THE WITNESS: Um, at some point in the future. I know that Ben and his dad had talked about, because his dad was living in Virginia at the time, that at some point they were going to live together, maybe in Asheville where my younger son is, but in the meantime Ben was going to come and live with me, which he did. And it's been a good -- it's been a good thing for me for him to be here, actually.

THE COURT: And you said he's been with you for two or two and a half years, correct?

THE WITNESS: Yes.

THE COURT: Okay. All right. I don't think I have any further questions.

All right. So, Ms. Carpenter, we will release you as a witness for the moment.

(Witness excused.)

THE COURT: Mr. Sharp, I'll turn back to you to see if you have anything further, proffers or otherwise, for the Court before we turn to argument.

MR. SHARP: Yes, Your Honor. And I would proffer this, and I'm sure Mr. Arrowood can correct me if it's inaccurate, but my understanding is that Mr. Carpenter is on the no-fly list, which would also include any type of sea travel as well, and that his passport was in fact seized by -- the FBI. So those would be my -- my three proffers. And then I would just have argument, Your Honor.

THE COURT: All right. Thank you.

All right. Are you-all ready to proceed with argument?

Mr. Arrowood?

MR. ARROWOOD: Yes, Your Honor.

THE COURT: All right. You may go ahead.

MR. ARROWOOD: All right. Thank you, Your Honor.

Yes, the government's seeking detention in this case. We don't believe there are conditions that would reasonably assure the appearance of the defendant or the safety of the community. We note that the probation office is also recommending detention in accordance with the submitted pretrial services report.

Your Honor, we believe the nature and circumstances

of the offense, in particular, for sure the nature and circumstances of the offense but also the defendant's history and characteristics, lead to the conclusion that he should not be released.  Your Honor, this -- the charged offense is indisputably serious.

In listing the nature and circumstances of the offense as charged as a criterion in the detention analysis, the Bail Reform Act specifically provides the Court is to consider, among other factors, whether the crime charged is a federal crime of terrorism.  The defendant has been charged with attempting to provide material support to ISIS in violation of Section 2339B of Title 18, which is a federal crime of terrorism.  Accordingly there's a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community.

Moreover, Your Honor, this particular offense has a 20-year statutory maximum.  Surely the Court understands that sometimes those statutory maximums mean a lot, sometimes they mean fairly little, in terms of what a defendant is actually exposed to.  So let me just highlight this for -- for the Court's analysis.  The base offense level for the crime the defendant's been charged with is 26.  However, pursuant to Section 3A1.4 of the sentencing guidelines there's a terrorism enhancement, and it states, "If the offense is a felony that

involved or was intended to promote a federal crime of terrorism, increase by 12 levels. If the remaining offense level is less than 32, increase to 32."

So here, Your Honor, he would be already looking at a 38 on the table. And then Subsection (b) of that enhancement states, "In each such case, the defendant's criminal history category from Chapter 4 shall be Category VI."

So defendant is facing, under the sentencing guidelines, a sentencing range of 360 months to life. So it's the government's position that if this defendant is going to be convicted of the offense charged, which we believe he will be, it's quite likely he will face the full 20 years in prison on this offense. And we think that's important for the Court to consider in context as it evaluates whether or not the defendant's a flight risk or whether the defendant poses a risk of danger to the community. Again, he is genuinely facing the very real likelihood of spending 20 years of his life in prison as a result of the offense charged.

So with respect to the circumstances of the offense, as we've mentioned before, the defendant was a leader and administrator of ATP, which is one of the most prolific and well-known pro-ISIS media organizations in the world. As the leader of ATP, the defendant created, translated, and disseminated official ISIS propaganda in English. In that

role, the defendant demonstrated his commitment to ISIS's violent ideology, working with other ATP members to engage in "jihad with a pen," in his own words. That was consistent with ISIS's instructions generally.

The government's evidence is replete with the defendant's statements expressing his commitment to ISIS and his role as the leader of ATP, which was a sophisticated organization of expert translators from all over the world dedicated to spreading ISIS's ideology to broader audiences, particularly western countries, as exhibited by the defendant's -- or the Government's Exhibits 3, 4, and 5, as we've discussed earlier.

Now, during most times relevant to the charged conduct, ATP members communicated via Telegram, as we've discussed. However, unbeknownst to the defendant, one of the members of one of ATP's groups on Telegram was an FBI OCE. The FBI OCE represented to the defendant that the OCE was a member of the Diwan, D-I-W-A-N. The term Diwan refers to ISIS's centralized organization that produces and initially disseminates official ISIS content. Beginning at the end of January the OCE informed the defendant that the Diwan was planning to reinitiate a former official ISIS media organization.

The OCE further advised the defendant that the Diwan wanted to translate multiple ISIS videos into English,

starting with the video released by ISIS in early January from the Sinai Province titled Bleeding Campaigns. The Bleeding Campaigns video is 25 minutes. It documents ISIS's military operations against Egyptian troops, and depicted ISIS fighters engaging in battle, detonating improvised explosive devices, firing mortars, and executing a suicide bombing. The video also shows the capture and subsequent executions of three individuals, including one that's alleged to be an Israeli spy. Your Honor, this video has not been included as an exhibit to the hearing, but we can provide it to the Court if necessary. It's quite graphic.

The defendant ultimately agreed to help and utilize the assistance of a fellow ATP member to assist in translating a transcript of the video. On or about February 14th, 2021, the defendant provided a complete English transcript of the video to the OCE, believing it would be used by ISIS.

So that's the nature and circumstances of the offense charged, Your Honor. Certainly it's very serious. But most importantly for the Court's awareness, the defendant is facing the likelihood of spending 20 years in prison.

Not only is the charged offense indisputably serious, but the defendant's history and characteristics, particularly his longstanding commitment to violent ISIS ideology, further underscores that he presents a risk of flight and danger to the community, especially keeping in

mind, again, the lengthy prison sentence he faces.

So with respect to risk of flight, the defendant has regularly expressed an interest and willingness to travel to foreign countries, the defendant's circumstances would allow him to flee, and the defendant has a plan to flee.

In late 2015 there was a search warrant executed on the defendant's devices, and on that search warrant were a number of messages he had with a resident in the United Kingdom. During those chats they discussed several details related to making hijrah, H-I-J-R-A-H. Hijrah, in the context of Islamic extremist groups, normally references the journey of a foreign fighter to join an Islamic extremist group abroad, like ISIS. They discussed whether Iraq or Syria was the best location for hijrah. They discussed the risks and complications associated with a female traveling to marry Al-Qaeda or ISIS fighters. They discussed the process for obtaining passports. They discussed whether it was permissible to take out a loan to enable a person to make hijrah when that person had no intention of paying back the loan. They discussed risks of being caught by government authorities while trying to make hijrah. And they discussed assisting other persons trying to make hijrah.

The defendant's circumstances would certainly allow him to flee. He doesn't have a full-time job. Aside from his mother living here in this district, he has no family

obligations here. He is not married. He does not have children. He has a part-time job that apparently he works about ten hours a week. The defendant is 31 years old. The defendant's full-time job, in the government's view, is his operation of ATP. And based on that operation, he has many international connections as a result of his role, including in particular Mr. Mohammed Ameen, who has been cited by the Treasury Department for being a recruiter for ISIS.

As indicated by the defendant's mother, he doesn't have a bank account and he has $3300 in cash, which certainly isn't a huge sum of money but is certainly sufficient to get him to Mexico, which is part of his plan to flee the United States. He's discussed traveling from the U. S. to foreign countries via Mexico in order to avoid detection, as you've seen in the exhibits that we filed with the Court, as well as within the past year advising someone else to do the same thing.

The defendant's history and characteristics demonstrate that his pretrial release would also present a significant risk of danger to the community, principally for two main reasons. First, the defendant is a sophisticated user of encrypted messaging platforms. He has a unique capability to operate in an online environment that avoids detection by law enforcement, and this ability would allow him to continue spreading pro-ISIS violent ideology were he to be

released.

And, second, when combined with the prospect of a 20-year prison sentence, the defendant's commitment to radical violent extremist ideology, as reflected in his connections with other individuals charged and convicted for terrorism crimes, including planning attacks in the U. S. and abroad, his consumption of ISIS-inspired violent materials, and his own words praising violent attacks poses an unacceptably significant risk that the defendant may decide to commit a violent act.

The defendant's highly security conscious. He's used techniques to hide his online activities, which would certainly be able to shield him from the Court's supervision. As I mentioned before, he has familiarity with VPNs, with Tor. And in the brief time that he had his new cell phone, he had already downloaded Orbot, which is an anonymizing tool specific for Android devices.

As indicated in the exhibit that discusses Mr. Dekkak's control order, the defendant has shown a disregard for court-ordered restrictions placed on others when it comes to communicating via encrypted messaging platforms. Not only has he expressed a disregard for those court orders, but he's indicated that he himself would be able to find a way to get around those court orders to communication with Mr. Dekkak even though he was prohibited from the court for doing so.

Furthermore, in addition to fellow ATP members and Mr. Dekkak, the defendant also associates with a number of other individuals, as we've discussed, that have been arrested for very serious terrorism offenses in the U. S. and abroad, including the Edmonds cousins; Mr. Ameen in the Maldives, Mr. Chudhary in the Eastern District of New York, Mr. Nuh Raheel in the United Kingdom.

Consistent with the defendant's commitment to ISIS, in addition to the ATP material described earlier, the government has uncovered numerous pro-ISIS images, videos, and documents advocating for violence. We saw those in the exhibits, whether it's about beheading, self-sacrificial operations, the use of WMDs against infidels, fighting Americans outside of Iraq. We've also seen videos that the defendant has consumed, in particular *For the Sake of Allah* video that was published by Al-Hayat, and also the video *The Rank*, which ATP had a role in translating.

In addition to being the leader and founder of ATP, the defendant has explicitly and repeatedly expressed his commitment to ISIS by praising ISIS attacks or attacks that were believed to be inspired by ISIS. We saw that with the Paris attack that was depicted in one of the exhibits. We saw that with his depiction of the Army explosive device manual, as well as his approving comment with respect to the bombing in Nashville.

Furthermore, in May of 2015 the defendant was interviewed. During that interview he told FBI agents that 9/11 was justified. In June 2016 he was interviewed again, and he stated that U. S. civilians should know that they were at war, and should expect to be victims of an attack. And these comments were not made in a chat room where he didn't feel like he would ever be held accountable. These statements were made to FBI agents investigating terrorism offenses.

Now, Your Honor, I suspect what the defendant's going to argue here is that we've known about him for five years, right, so why is he a danger today. So let me just address that now. First, his conduct has evolved over time. He's becoming more and more prolific, and ATP is becoming more and more prolific. And he's now, as depicted earlier in the -- when we discussed nature and circumstances of the offense, he's engaged directly with an OCE in an attempt to help ISIS translate ISIS material into English.

Furthermore, Your Honor, it's not as if the government was waiting five years for him to cross the line. The government was overt. In 2015 we did a search, we interviewed him. We interviewed him again in June 2016. We interviewed him again -- or in October 2015 as well. This defendant's been aware he's been on the FBI's radar, and has done little to change his life. In fact, he's gone to ground, he's further obfuscated his conduct to shield it from

detection by law enforcement.

But the most important fact here, Your Honor, is the defendant's changed circumstances. Up until March 24th of 2021, this defendant was not expecting to spend 20 years of his life in prison. Today he should be expecting to spend the next 20 years of his life in prison. That changed circumstance is incredibly important when considering the context within which the government's argument is being made with respect to risk of flight and danger to the community.

I understand as well that the defendant is going to offer to have his mother serve as a third-party custodian. Your Honor, we would respectfully suggest and urge the Court to reject that. While there's certainly nothing specific with respect to his mother that's concerning, except for the fact that his son has been -- her son has been living there for two years, in a room that is feet away from her bedroom, and has engaged in this online ISIS ideology promotion on likely a daily basis since he's been there, again, this is his full-time job, and he's done it from the very home that the defendant is going to suggest that he go back to.

Moreover, Your Honor, I understand that the defendant's mother is going to say that she can turn off the Internet. But she also lives in a neighborhood. I suspect that it's not appropriate for the Court to require all of the defendant's neighbors to turn off their Internet, too, nor has

it been suggested that the defendant's mother would give up her cell phone, which, as we've demonstrated before, the defendant has used his mother's devices in the past.  And given the fact that ATP's his full-time job and he's facing 20 years in prison, we don't think it's reasonable to expect that he would not continue to try to use his mother's devices to continue the same type of conduct that's outlined in these exhibits, Your Honor.

With respect to the nature and seriousness of the danger to any person or the community posed by his release, the government has identified three such risks, the first being that he will continue his pro-ISIS propaganda war, he'll continue promoting pro-ISIS ideology, continue disseminating it to the west.

We're further concerned that were he to be released, he'd be able to alert other ATP members about his arrest and the specifics about his arrest, as many of those ATP members are located overseas and are under organization by foreign governments.

And finally, Your Honor, the government is concerned that the defendant may conclude that given the fact that he's about to spend 20 years of his life in prison, that he may wish to engage in some sort of violent act.  As you mentioned before, the defendant faces 20 years.  While not every defendant with little criminal history facing 20 years is a

flight risk or a danger to the community, this defendant is. This defendant is a radical extremist who supports ISIS-inspired violence, advocates for violence, and believes violence is justified in furtherance of jihad. He has very little keeping him here. According to his own words, he knows he could flee to Mexico. He has the expertise and the willingness to continue his pro-ISIS operations undetected. He has international connections, many of whom have been charged with terrorism offenses, are under investigation by law enforcement, and one of which is an ISIS recruiter. And he believes conducting violence against Americans is both justified and even required as part of his violent ideology.

So, Your Honor, we do not believe this is a case where this defendant should be released. We urge the Court to keep this defendant detained pending trial, consistent not only with our arguments here today before the Court but also the recommendation by the probation office. So subject to any questions the Court has, Your Honor, that's all. Thank you.

THE COURT: All right. Thank you, Mr. Arrowood.

Mr. Sharp?

MR. SHARP: Thank you, Your Honor.

Well, the question before the Court today doesn't have anything to do with guilt or innocence, of course. It -- it comes down to are there conditions or a combination of conditions that could be placed to limit the risk of either

nonappearance or risk to the community. And I believe that defendants have shown that there were several of those conditions and combinations of conditions that in fact can do that.

Mr. Carpenter is willing to abide by any and all conditions that this Court feels is appropriate, and among those being house arrest, living with his mother, home electronic monitoring to make sure that his location is known.

Ms. Carpenter has said that she will in fact remove the Internet from her home. I recall her testifying on direct that she would get rid of the smartphones, that she was aware that they are essentially small computers, and that she would be willing to get rid of those during the period of time that Mr. Carpenter would be on pretrial release in her home, that she would either help him work and get him to and from his employment, or if the Court deemed that he should only be under house arrest and not leave for work, that she was willing to take on that obligation as well.

Mr. Carpenter certainly would make himself available for any type of drug or alcohol testing. I don't believe that he uses any substances. I do know that he has three very minor drug-related misdemeanor offenses from when he was 18, I believe, maybe 19, so 12 or so years ago. If there was any concern about that, he's more than willing to submit to any type of drug testing.

The fact that he doesn't have a criminal record has to be taken into account. Other than the three misdemeanors, he has shown as someone who is not prone to violence. Even though there's been many allegations here today, I would remind the Court that these are merely allegations. This Court -- or this case is actually interesting. I believe that we are going to be dealing with a lot of First Amendment issues. I think we're going to be dealing with a lot of freedom of religion issues. And just because the government feels that these interpretations are violent in their estimation doesn't in fact mean that that's the same interpretation that someone else would have. So I do think that it is going to be an interesting case. But we're not deciding those issues here today.

Mr. Carpenter has not shown any evidence that he has attempted to leave the country. I know aside from some of these chats the government hasn't produced any evidence that he's made any attempts to leave the country. Short of getting a passport at some point in his previous history, there's no indication that he ever attempted to get to Mexico, that he ever attempted to get to Canada, that he attempted to board a flight here in the U. S. Additionally he's on the no-fly list, which covers pretty much all international travel. Thirty-three hundred dollars in an envelope, for somebody who doesn't have a bank account, one, is not a great sum of money.

Could it get you to Mexico? I think that's debatable. But, again, there's no evidence to show that he has attempted to get to Mexico. And if the Court wanted to seize those funds, which have already been taken by the FBI, he does not have those funds any longer, so I think that that takes any of that risk off the table as well.

As noted, there are no firearms in the home. There doesn't seem to be anything wrong with the house or the setup. According to the pretrial service report, the home seems suitable to allow him to stay there.

And there will be a time that this case is heard on its merits, and the government will have every opportunity to prove every allegation that they've made, but they've not done that up to this point, nor is that the purpose of this hearing. The purpose is, are there conditions on which Mr. Carpenter can be released. Certainly we believe that there are more than enough conditions to overcome the presumption of detention. And even the articles that were cited in the exhibits today, when you look at the timeframe, going back to 2015 it doesn't appear that Mr. Carpenter has engaged in different activities starting from then until now. As noted, he's voluntarily talked to the FBI three different times during that period of time. And it feels disingenuous to argue that he is a threat today when he wasn't a threat during those other periods of time. So it's either the

government has allowed him to be a risk and a threat to the community for the past six years, or the argument here today is not sincere.

So we would ask the Court to allow him to be on pretrial release, to give us the opportunity to establish a defense for him and then ultimately have this matter heard on its merits.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Sharp.

All right.  Mr. Arrowood, anything further?

MR. ARROWOOD:  No, Your Honor.  We'll rest on our argument.  Thank you.

THE COURT:  All right.  Thank you.

All right.  Given the amount of material that was discussed here today and provided for the Court's review, I will certainly need to take a little bit of time to review all of this.  So I will be taking the matter under advisement so I can give it full consideration of all this information.

So I thank you-all for your participation by video today.

And thank you, Ms. Carpenter, for linking in so that you could participate by video as well.

All right.  Is there anything further that we need to take up before we conclude the hearing, Mr. Arrowood?

MR. ARROWOOD:  No, Your Honor, not on behalf of the government.  Thank you.

THE COURT: All right.

Mr. Sharp, anything further on behalf of Mr. Carpenter at this time?

MR. SHARP: No, Your Honor. Thank you.

THE COURT: All right. Thank you to you all.

THE COURTROOM DEPUTY: All rise. This honorable court stands in recess.

END OF PROCEEDINGS

I, Elizabeth B. Coffey, do hereby certify that I reported in machine shorthand the proceedings in the above-styled cause, and that this transcript is an accurate record of said proceedings.

s/Elizabeth B. Coffey
Elizabeth B. Coffey,
Official Court Reporter