IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff ) | |
| v. ) | NO.: 3:21-CR-38-KAC-DCP |
| ) | |
| BENJAMIN ALAN CARPENTER ) | |
|     Aka Abu Hamzah, ) | |
|     Defendant. ) | |

## BENJAMIN CARPENTER'S MOTION FOR VARIANCE/DEPARTURE AND SENTENCING MEMORANDUM

Mr. Carpenter respectfully moves the Court to sentence him to a term of imprisonment that is not greater than necessary to achieve the purposes of sentencing and to consider a sentence of less than sixty months, to include consideration of a sentence of the 39 months he will have served in pre-trial detention at the time of sentencing. Although Mr. Carpenter has been convicted of a serious offense, his conduct was less harmful than other activity prohibited by the statute, and he should not receive the maximum sentence authorized by Congress.

Mr. Carpenter's Guidelines, without the terrorism enhancement and with credit for acceptance of responsibility would be 51-63 months. Without acceptance of responsibility his range would be 63-78 months.

Mr. Carpenter does not deserve the same sentence as someone who actively assisted a foreign terrorist organization by providing weapons or explosives. The potential use of the terrorism enhancement under U.S.S.G. Section 3A1.4(a) in this case to impose the maximum sentence allowed by Congress, skews the sentence in a way that would not be just or reasonable. The Government's interpretation of the "terrorism enhancement" would make it applicable in all

cases, which would render the base offense level meaningless. Doc. 222, Government Response to Notice of Objections.

The nature of the offense conduct shows that if the base offense level should be applied in any case, it would be this one. Mr. Carpenter forwarded an English translation of a video about fighting in Egypt and then forwarded edits back to the undercover operative. The conduct is contained in Government Trial Exhibit 18, the transcript of text messages with the undercover operative. The person never says he's an ISIS member. The confidential operative said that the persona he created was not an ISIS member but was connected. Originally, Mr. Carpenter said that he could not help with videos. Ex. 18, p. 29. On February 1, 2021, the undercover employee sent Mr. Carpenter a purported transcript of the relevant video in Arabic. Ex. 18, p. 57. A few minutes later he sent an English version in a Word document. Mr. Carpenter replied that the translation was already "very good." After further discussion about the translation, the undercover employee sent an updated English translation on February 7, 2021, and an updated Arabic transcript with time stamps. Ex. 18, p. 77.

On February 10, Mr. Carpenter wrote that he sent the translation to someone else to check. Ex. 18, p. 82. The evidence indicates that this was true because Special Agent Smith said that they know who the person was.

On February 14, 2021, Mr. Carpenter texted the revised English version back to the confidential operative. Ex. 18, p. 93. Defense exhibit 1 shows the nature of the edits to the transcript.

On February 13, Mr. Carpenter appears to say that a video on the deviance of the Taliban would have been more important. He suggested the *To be Absolved* video, which shows Mr. Carpenter's interest because this was a video about why the Taliban's theology is wrong.

On February 17, a partial transcript of the video dealing with the Taliban is sent by the OCE. Ex. 18, p. 98.

On February 27, 2021, another English translation was sent by the OCE, Ex. 18, p. 124.

From February 27 until his arrest on March 22, nothing happened with that translation. Mr. Carpenter never sent edits back.

That was the offense. Mr. Carpenter never asked to be connected to any Islamic State members; he never offered financial assistance. Unlike many people prosecuted under this statute, he did not attempt to travel to one of the areas in conflict to assist the FTO.

1. **Guideline Calculations**

Defendant Benjamin Carpenter has provided notice of his objections to the Presentence Investigation Report filed April 3, 2024. [Doc. 215]. Mr. Carpenter respectfully asserts that his presentence report should be amended to (1) remove the terrorism enhancement applied in paragraph 27, (2) remove conduct described in paragraphs eighteen, nineteen, and twenty from Part A "The Offense", and (3) apply a two-level decrease for acceptance of responsibility.

Mr. Carpenter was convicted of attempting to provide material support to a designated foreign terrorist organization through translation services, a violation of 18 USCS § 2339B. Mr. Carpenter agrees with the Report's finding that the base offense level is 26. [Doc. 215, ¶ 25]. Mr. Carpenter respectfully asserts that his total offense level should be 24 with a criminal history of I

because the terrorism enhancement should not apply, and he should receive a reduction for acceptance of responsibility.

2. **Sentencing Enhancement § 3a1.4(A) Should Not Apply Because Mr. Carpenter's Conduct Was Not Calculated to Influence or Affect the Conduct of Government by Intimidation or Coercion or to Retaliate Against Government Conduct.**

An enhancement under USSG § 3a1.4(a) is not appropriate in Mr. Carpenter's case because the offense that he was convicted of was not committed with the specific intent to influence affect the conduct of any government. This enhancement may be applied when an offense "is a felony that involved, or was intended to promote a federal crime of terrorism." *Id*. A federal crime of terrorism must meet two criteria: (1) it must violate one of the listed statutes and (2) it "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 USCS § 2332b(g)(5). The enhancement increases the offense 12 levels and increases the defendant's criminal history to category VI regardless of the defendant's actual criminal history. USSG § 3a1.4(a). The Sixth Circuit has determined that the appropriate standard of proof for an enhancement under the sentencing guidelines is preponderance of the evidence. *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001) (citing *United States v. August*, 984 F.2d 705, 714 (6th Cir. 1992)). However, because this enhancement increases the guidelines so substantially, Mr. Carpenter submits that the standard of proof should be clear and convincing if not beyond a reasonable doubt. *See United States v. Graham*, 275 F.3d 490, 540 (6th Cir. 2001) (J. Cohn dissenting); *see also United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020) (requiring clear and convincing evidence where terrorism enhancement raised defendant's potential sentence by 264 months).

Mr. Carpenter was convicted of an offense under 18 U.S.C. § 2339B, attempting to provide material support to a foreign terrorist organization, which is listed as one of the predicate offenses

to establish a federal crime of terrorism. The analysis then turns on whether Mr. Carpenter's offense has the specific intent to influence or affect government conduct by intimidation or coercion or retaliate against government conduct. 18 U.S.C. § 2332b(g)(5).

The terrorism enhancement is not automatically triggered by a material support conviction. *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020); *see also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (upholding a decision not to apply terrorism enhancement to a material support conviction involving translation services). "Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes." *Id*. This section imposes "a specific intent requirement." *Id.* at 700 (external citations excluded); *United States v. Stafford*, 782 F.3d 786, 795 (6th Cir. 2015) (stating "Application of the enhancement requires proof of the defendant's specific intent"). A proper analysis does not focus on the defendant but on whether this specific offense was calculated "to achieve the stated object." *Alhaggagi*, 978 F.3d at 700.

> Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. "Motive" is concerned with the rationale for an actor's particular conduct. "Calculation" is concerned with the object that the actor seeks to achieve through planning or contrivance. Calculation may often serve motive, but they are not, in fact, identical. Section 2332b(g)(5)(A) does not focus on the defendant but on his "offense," asking whether it was calculated, i.e., planned - for whatever reason or motive - to achieve the stated object.

*United States v. Hendricks*, No. 1:16CR265, 2019 U.S. Dist. LEXIS 45049 (N.D. Ohio Mar. 19, 2019) (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)) (citations and quotations omitted). "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *Alhaggagi*, 978 F.3d at 700. (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)); *see also United States v. Jumaev*, 2018 WL 3490886, *10, 2018 U.S.

Dist. LEXIS 119916, CR 12-0033 JLK (D. Colo. July 18, 2018) (detailed analysis of application of terrorism enhancement, declining to apply it to defendant in material support case).

Based on the proof elicited at trial and the government's theory and expert testimony, the purpose of the offense was to influence English speaking individuals who might become sympathetic to ISIS; it was not calculated to influence or affect government conduct. The enhancement does not apply in all material support cases and should not be applied to Mr. Carpenter's interaction with the undercover operative in this case.

Mr. Carpenter's conviction does not justify the application of this enhancement, which could effectively triple his sentence. The Government's argument throughout trial was that Mr. Carpenter's conduct in providing translation services related to *To Be Absolved Before Your Lord* and *Bleeding Campaigns* constituted material support because it was aimed to make ISIS materials accessible to English-speaking people. *See* Doc. 208 at 66 (Dr. Winter testifying that ISIS "considers that to be a way to recruit, a way to generate appeal, garner appeal among its support base."); Doc. 208 at 94-95 (Dr. Winter's testimony stating that translations are important because "the Islamic State would try to translate as much of or at the very least the most strategically-significant aspects of its media output" to try and reach supporters in western countries); Doc. 208 at 96 (Dr. Winter testifying about the importance of specific translations from Arabic to other languages because "ISIS adherents who do not speak native Arabic" use a particular form of speech that would sound strange to people unfamiliar with ISIS). There is no evidence that Mr. Carpenter attempted to provide translation services related to the videos *To Be Absolved Before Your Lord* or *Bleeding Campaigns* with the specific intent to influence or affect the conduct of a government by intimidation or coercion nor retaliate against government conduct.

While there was evidence introduced at trial that discusses Mr. Carpenter's ideological views, this enhancement should be applied only when the government shows that the offense itself was calculated to "influence or affect conduct of government by intimidation or coercion or retaliate against government conduct." 18 USCS § 2332b(g)(5). Much of the material cited by the Government in opposition to Mr. Carpenter's objections was material that the Government said Mr. Carpenter "consumed" or was admitted to show that Mr. Carpenter knew that ISIS was a terrorist organization. See Doc. 222, pp. 7-8.

Mr. Carpenter's conduct varies drastically from many of the cases where courts have applied the terrorism enhancement. Mr. Carpenter's conduct did not target any type of government infrastructure. *See United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (applying the enhancement because defendants planted explosives on a Cleveland bridge).

### a. Bleeding Campaigns

Mr. Carpenter told the OCE not to focus on *Bleeding Campaigns* because he believed that it did not contain information about theological matters. Doc. 21, Transcript Vol. 5 at 113. Mr. Carpenter did not see its importance. Additionally, Mr. Carpenter opened the first copy of the English translated transcript for five to ten seconds. Doc. 211 at 112. There is no evidence that Mr. Carpenter looked at revised versions of the document. *Id*. Mr. Carpenter did not create or endorse the content of the video. The Government must show that Mr. Carpenter's offense was calculated to influence or affect government actions or retaliate against a government. The act of forwarding the transcript to another individual to provide translation services does not show a specific intent to influence or affect government conduct, nor a specific intent to retaliate against government conduct.

### b. To Be Absolved Before Your Lord

Any conduct related To Be Absolved Before Your Lord, was not intended to influence of affect government conduct, nor was it intended to retaliate against the government. Dr. Winter first described *To Be Absolved Before your Lord* stating, "It was a series of videos published a few years ago now by the official media office, well, official media offices of the Islamic State. One of those offices was based in Afghanistan, which refers to as Wilayah Khorasan. That means Khorasan province. And Khorasan is essentially Afghanistan and parts of Northwest Pakistan and parts of Iran as well. That video attacks the Afghan Taliban, accuses them of being corrupt apostates and illegitimate." Doc. 208 at 64-65. The government argued in closing that, "This video series of three different videos that distinguish ISIS from other foreign terrorist organizations, one being al-Qaeda of the Arabian Peninsula, another being al-Shabaab and the Taliban." Doc. 212 at 26. It is clear that the video that Mr. Carpenter was familiar with and was advocating for the translation of was content that actually criticized a different terrorist organization. *Id*. There is no evidence that Mr. Carpenter intended to influence government conduct nor retaliate against government conduct by attempting to provide translation services in the first place and it is especially true in relation to this video because of its subject matter. The Government's response to Mr. Carpenter's objections suggests that the motivation for this video was influencing the government of Afghanistan. Doc. 222, p. 4. But the Taliban was not the government of Afghanistan at the time. It was a terrorist organization seeking to overthrow a government. Even now, the United States does not recognize the Taliban as the legitimate government in Afghanistan. U.S. Dept. Of State, 2022 Country Reports on Human Rights Practices: Afghanistan (2022), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/afghanistan/.

3. **Acceptance of Responsibility**

Paragraph 23 states that Mr. Carpenter has not clearly demonstrated acceptance of responsibility. The Court considers a variety of factors in considering whether a defendant has accepted responsibility, including the following: admitting the conduct that makes up the offense, voluntary surrender to authorities, and timeliness in manifesting the acceptance of responsibility. 18 U.S.C. § 3E1.1, cmt. 1.

A defendant does not automatically forfeit consideration of a reduction under this guideline when he goes to trial.

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

18 USCS § 3E1.1, cmt. 2. In this case, Mr. Carpenter raised multiple constitutional arguments. He also maintained that his conduct did not violate the law. Mr. Carpenter spoke openly with law enforcement about his activities on several occasions and testified about his conduct. For this reason, Mr. Carpenter submits that he should receive a reduction of two levels for acceptance of responsibility.

Mr. Carpenter realizes that it is rare for courts to find acceptance of responsibility after trial. But to the extent that the Government claims acceptance should be denied for "putting the United States to years of pre-trial litigation, losing multiple dispositive motions," the Government's response supports Mr. Carpenter's position. See Doc. 222 at p. 12. Mr. Carpenter did raise constitutional issues and did want to preserve them. There is a difference between accepting responsibility, which Mr. Carpenter did by admitting his conduct and speaking with

agents, and apologizing, which he did not do. If the defendant is required to acknowledge that the Government was right about everything in order to receive acceptance of responsibility, then he would not be entitled to it. But the words of the Guideline and Commentary suggest otherwise.

4. **Objection To Paragraphs Eighteen, Nineteen, And Twenty Listed Under "The Offense."**

Although these paragraphs do not affect the Guideline level, the paragraphs discuss *From Dabiq to Rome* and a video titled *The Rank*. Mr. Carpenter was not charged with conduct related to either of these publications.

Paragraph Eighteen and Nineteen discusses a video that was introduced during Special Agent Richard Smith's testimony. Doc. 210 at 163. As Mr. Carpenter explained during his testimony, the text of this video is a recitation of the Quran. Doc. 211 at 100. Mr. Carpenter testified that he asked a "brother" to create a video with this recitation and did not create the visuals himself. Doc. 211 at 100. There is no indication of the date that this video was created. Because this video is not part of the conduct that is alleged in the indictment, Mr. Carpenter asserts that its inclusion in the presentence report as "The Offense" is improper.

Paragraph Twenty discusses an ATP publication called *From Dabiq to Rome*, focusing specifically on Issue # 35. This issue was produced in November 2018. Mr. Carpenter was convicted of conduct that occurred in January through March of 2021. None of the alleged conduct related to Issue # 35 of *From Dabiq to Rome,* nor any issues of this publication.

5. **Variance And Departure Are Necessary to Achieve a Just Sentence**

The fact that the Guidelines as calculated in the Presentence Report call for the statutory maximum sentence underscores why *United States v. Booker,* 543 U.S. 220, 259-60 (2005), and its progeny, hold that the Guidelines are merely one factor for the Court to consider at sentencing,

along with the other factors enumerated in § 3553(a). This discretion to vary from the Guidelines is important to achieve a just sentence in accordance with 18 U.S.C. § 3553(a).

6. **The Terrorism Enhancement's 12-Level Increase Treats All Offense Conduct the Same.**

Relying on the Guideline sentence with the terrorism enhancement in all cases would result in a default sentence of the maximum statutory term, regardless of the conduct. Mr. Carpenter, who forwarded transcripts to and from an undercover agent would face the same sentence as a defendant who provided a bomb face to face with fighters in a terrorist camp. The terrorism enhancement's twelve-level increase fails to make any distinction between the types of conduct. For this reason, it provides this Court little guidance.

> Courts have observed that the 12-level enhancement is not backed by empirical evidence:
>
> [T]he 12-level enhancement in overall offense level is the result of a congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies. *See* U.S.S.G. App. C, Amend. 526. Second, the language of the enhancement is so broad so as to encompass virtually every terrorism—related case, without distinguishing between those cases in which harm occurred and cases in which it did not.

*United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002, at *20 (S.D.N.Y. June 4, 2013).

> [A]pplication of the Terrorism Enhancement to the calculation of [the defendant's] offense level has the effect of obscuring the differences between [the defendant's] offense conduct, which did not result in any actual harm, and an instance where such conduct did result in actual harm. Such a distinction has been found to be a legitimate basis for imposing a lower sentence, even in a case involving terrorism offenses." *See United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009).

*Nayyar*, 2013 U.S. Dist. LEXIS 79002, at *21.

7. **Grounds for Departure**

If the Court applies the terrorism enhancement, Mr. Carpenter moves for a departure and/or variance because the Guideline calculation overstates the seriousness of the offense.[1] Mr. Carpenter moves for departure under the following provisions:

a. **4A1.3 Criminal History Inadequacy.** The Guideline turns criminal history on its head, treating Mr. Carpenter, who has a criminal history score of 0, as a category VI. Mr. Carpenter has no record of any violent offense. Over a decade ago, Mr. Carpenter had some dismissed offenses relating to his use of marijuana, which he described at trial as something he gave up many years ago. There is no reasonable basis for treating him as though he had 13 or more criminal history points.

b. **5K2.0 Mitigating Circumstances.** Because the Sentencing Commission did not consider empirical evidence when formulating the terrorism enhancement and because by definition the Commission could not have taken into account the circumstances of a first offender in an undercover operation who facilitates the exchange of edits to a transcript, a departure is

---

[1] Because of the substantial overlap between the grounds for departure under the Guidelines and variance under Section 3553(a), Mr. Carpenter moves for consideration of these facts and issues both in granting a departure and variance. There may be issues that don't meet the criteria for departure but do justify a variance or vice versa. The use of variance instead of departure is one reason that the Sentencing Commission is considering amending the Guidelines to intertwine the now separate inquiries. As the Commission describes the proposal: "Consistent with the revised approach, the proposed amendment would reclassify most "departures" currently provided throughout the Guidelines Manual. Under the new approach, current departure provisions would be retained in more generalized language. Instead of being identified as departures, they would be generally reclassified as "Additional Considerations" that may be relevant to the court's determination under 18 U.S.C. § 3553(a)." United States Sentencing Commission, Proposed Amendments to United States Sentencing Guidelines, published December 26, 2023, p. 124. https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf

warranted under Section 5k2.0. Another factor that could not have been taken into consideration, which is also relevant under Section 3553, is that regardless of his sentence and the fact he poses no danger of violence, Mr. Carpenter will likely be designated to an incredibly difficult and restrictive prison based on the offense of conviction alone.

c. **5K2.11 Lesser Harm.** Mr. Carpenter's conduct undoubtedly caused lesser harm than the other conduct that is lumped in with the 240-month Guideline range created by the terrorism enhancement.

8. **Variance**

   a. **Nature and Circumstances of the Offense**

Pursuant to 18 U.S.C. § 3553(a)(1), a below Guidelines sentence is appropriate based on the nature and circumstances of the offense. Here, the unlawful conduct was of limited scope and duration. The Court had the benefit of hearing the proof at trial. Between January 30, 2021, and February 14, 2021, Mr. Carpenter engaged in a series of text communications with an undercover agent and forwarded an English transcript of the Bleeding Campaigns video to someone else for editing. He returned the edits to the undercover operative. The video did not address conduct by the United States or in the United States. The video was about Egypt. The video was apparently designed to promote sympathy for the ISIS fighters. There was no participation in any plan of violence or any of the conduct one normally associates with terrorism.

   b. **History and Characteristics of the Defendant**

The history and characteristics of the defendant, under 18 U.S.C. § 3553(a)(1), warrant a downward variance. Mr. Carpenter has very different views than most Americans. But he is an intelligent, thoughtful young man who has close relations with his family. Mr. Carpenter has submitted a letter to the Court for consideration. Exhibit 1. Mr. Carpenter's mother, father and

13
Case 3:21-cr-00038-KAC-DCP    Document 223    Filed 06/05/24    Page 13 of 20
PageID #: 4305

brother have also written letters to provide insight into Mr. Carpenter's history and characteristics. Exhibit 2.

Mr. Carpenter has no history of violence. At trial, he confirmed that he does not believe in beheadings or other acts of violence. Mr. Carpenter's offense conduct was caused by his firmly held religious beliefs. Mr. Carpenter never attempted to try to commit any act of political or religious violence. He did not travel in support of a cause. He communicated with other people who shared many of his views.

Much of Mr. Carpenter's time, both before and after the offense, has been spent studying religious texts and other works. Since being incarcerated, Mr. Carpenter has enrolled in a paralegal program at Blackstone Career Institute, which he will finish soon.[2] He has done well in the program and is thinking about the future.

The Court had a chance to see Mr. Carpenter's behavior through all court proceedings and the trial. He was respectful of the Court, the Government attorneys, the Deputy Marshals. He accepted the verdict calmly. Mr. Carpenter's conduct while acting pro se also demonstrates his history and characteristics. He took principled positions, wrote respectfully, and even had the chance to present oral argument before the Magistrate Judge. Again, he behaved calmly and thoughtfully.

Even his employment indicates that he is a caring person. He took care of animals at Waggy Tails. His mother's letter provides insight into his kindness. The portrayal of Mr. Carpenter in court does not provide insight into his personality in a way his mother's observations of him bottle

---

[2] https://blackstone.edu/correspondence-paralegal-certificate-program/

raising kittens can. His mother also confirms that he never owned weapons. Although Mr. Carpenter's parents do not share his beliefs, his mother writes that in their discussions Mr. Carpenter never supported violence. In his letter to the Court, Mr. Carpenter states that he does not advocate violence.

Mr. Carpenter's brother Matt describes Ben's support when Matt was struggling with addiction. After Matt completed a rehabilitation program, Ben would even drive him to work every day.

Based on his history and characteristics, it is inappropriate to characterize him as a criminal history category VI. His only arrests were the result of early drug use which he confronted on his own and quit.

c. **Seriousness of the Offense, Respect for the Law and Just Punishment**

Pursuant to 18 U.S.C. § 3553(a)(2)(A), a below Guidelines Sentence would reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense. To punish Mr. Carpenter exactly the same way as someone whose conduct was much worse would, in fact, undermine respect for the law because sentencing is supposed to be individualized. Reflecting the seriousness of the offense is difficult. There is no doubt that a violation of 18 U.S.C. § 2339B is a serious offense. However, "material support" can mean many things, including providing money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications, equipment, facilities, weapons, lethal substances, explosives, personnel, and transportation. 18 U.S.C. § 2339A(b)(1). Looking at these definitions, what comes to mind is someone who is directly helping an FTO carry out terrorist activities. Though serious, Mr. Carpenter's conduct was at the less serious end of the scale. It would not reflect the seriousness

of the offense or promote respect for the law to treat Mr. Carpenter like someone who committed a more serious version of material support.

In this case, it is appropriate to vary from the Guideline range based on a policy disagreement with the Guidelines as applied to Mr. Carpenter's conduct. *Kimbrough v. United States*, 552 U.S. 85 (2007). The Sentencing Commission determined that the base offense level for attempting to provide material support for a foreign terrorist organization is 26. There had to be a reason for that determination based on the charter of the Sentencing Commission. For the terrorism enhancement to apply in all cases renders that determination meaningless. Mr. Carpenter respectfully asks the Court to apply the judgment of the Commission that the base offense level should be 26 and find that an additional 12-point increase without facts that justify such an enhancement and sentence Mr. Carpenter based on a level 26. Courts have noted the lack of empirical evidence supporting the terrorism enhancement. The Court in *United States v. Jumaev* recently refused to apply the enhancement in part because it "is not backed by any empirical evidence" and because "treating all 'terrorists' alike is impermissible under our sentencing paradigm." 2018 WL 3490886, *10, 2018 U.S. Dist. LEXIS 119916, CR 12-0033 JLK (D. Colo. July 18, 2018).

d. **Deterrence**

Mr. Carpenter has been in pretrial incarceration since March 2021 under difficult conditions. He will have served 39 months by the time of sentencing. He has been housed in a maximum-security facility. This period of incarceration itself, under the circumstances, would provide adequate deterrence. The case itself establishes that the Government will prosecute any conduct that purports to provide support for anyone associated with an FTO. Additionally, Mr. Carpenter was well known in his circle of individuals with similar interests. They know that Mr.

16

Carpenter has been incarcerated. Further incarceration is not necessary to protect the public from further crimes by Mr. Carpenter. 18 U.S.C. § 3553(a)(2)(C). Mr. Carpenter has the ability to comply with the law. He will also be closely monitored on supervised release.

While pretrial confinement is an appropriate consideration at sentencing, in addition, Mr. Carpenter will not have the same experience as most federal inmates whose conditions improve once they reach the designated Bureau of Prisons facility. Because of the nature of the offense of conviction, Mr. Carpenter will likely be designated to a high security restrictive environment.[3]

    e. **Other factors**

The consideration of educational or vocational training, medical care and correctional treatment do not seem to weigh in favor of a Guidelines sentence because Mr. Carpenter will be able to avail himself of any available programs regardless of the length of sentence. 18 U.S.C. § 3553(a)(2)(D).

    f. **Sentencing Disparity**

A significant downward variance should be granted to avoid serious sentencing disparity. 18 U.S.C. § 3553(a)(6). Most defendants under this Guideline or who have committed similar offenses have done much worse and received sentences much lower than the Guidelines with the terrorism enhancement would require. For the Court's reference in analyzing sentencing disparity in this case, Mr. Carpenter has attached a chart outlining relevant cases and their corresponding sentences. *See* Ex. 4. Mr. Carpenter asks that these cases be included when the Court performs its

---

[3] A thorough discussion of designation and security classification under the Bureau of Prisons Program Statement 5100.08 is found Inmate Security Level and Redesignation Polices is found in *Iglesias v. Fed. Bureau of Prisons*, No. 19-CV-415-NJR, 2021 U.S. Dist. LEXIS 245517, at *12 (S.D. Ill. Dec. 27, 2021).

analysis under § 3553(a)(6). Exhibit 5 is a compilation of press releases and other documents from the Aws Mohammed Younis Al-Jayab, Vo, Elawal and Osadzinski cases that provide further context of the sentences in those cases.

For example, Aws Mohammed Younis Al-Jayab was sentenced to sixty months in the Northern District of Illinois. *See* Ex. 5. He was convicted of providing material support to a foreign terrorist organization and providing materially false statement to a federal agent involving international terrorism. The factual basis for his conviction included traveling to Syria and Turkey and fighting with Ansar Al-Islam, a designated foreign terrorist organization. Mr. Carpenter's attempted conduct did not include traveling, nor physical fighting and violence alongside a foreign terrorist organization.

Joshua Stafford and four co-defendants were charged with conspiring to use weapons of mass destruction, attempting to use weapons of mass destruction, and attempting to damage or destroy property in interstate commerce by means of explosives. *United States v. Stafford*, 782 F.3d 786, 789 (6th Cir. 2015). The basis for this conviction was the planning of bombing a bridge in Cleveland, Ohio. *United States v. Wright*, 747 F.3d 399, 405-06 (6th Cir. 2014). The group communicated with an undercover agent, who they believed to be an arms dealer, to obtain riot gear and explosives. *Id*. at 406. They then met with the undercover agent and obtained "inert C-4 explosive devices" and the gear. *Id*. The next day, the group placed the explosives on the column of a bridge and attempted to detonate the bombs by cell phone. *Id*.

While the offenses in the attempted Cleveland bridge bombing case are different from Mr. Carpenter's case, the terrorism enhancement was applied in all but one of the co-defendants' cases. *Id*. At 407. The Court sentenced Stafford outside of the range to 120 months. *Stafford*, 782 F.3d at 790. The Court sentenced co-defendant Brandon Baxter to 117 months. *Wright,* 747 F.3d 399 at

407. The Court sentenced co-defendant Connor Stevens to 97 months. *Id*. The Court sentenced Douglas Wright to 138 months. *Id*. Unlike these cases, Mr. Carpenter did not attempt any violent conduct, nor did he target any government building or infrastructure. The co-defendant's conduct in these cases were significantly more serious than Mr. Carpenter's offense.

Mr. Carpenter's conduct is more closely comparable to the conduct in Kim Anh Vo's case. *United States v. Vo*, No. 1:19-cr-223 (S.D.N.Y. Fed. 23, 2023); *see also* ex. 5 Vo was convicted of conspiracy to provide material support to a foreign terrorist organization. *See* Judgment in a Criminal Case, *United States v. Vo*, No. 1:19-cr-223 (S.D.N.Y. Fed. 23, 2023). Vo took part in an online group known as the United Cyber Caliphate. *See* Ex. 5. This group distributed ISIS propaganda including videos, identifying information in the form of a kill list, and other propaganda. *Id*. Vo was sentenced to time served for this offense, which amounted to roughly 12 months of incarceration. *Id* (Ex. 5 includes the docket sheet from Vo's case which shows her pretrial release roughly a year after arrest). Similarly, Mr. Carpenter was convicted of conduct that involved ISIS propaganda and online activity.

Additionally, the Presentence Report provides important information from the Sentencing Commissions JSIN database. PSR, par. 78. Although the sample size is small, in the past five years, for defendants whose primary Guideline was 2M5.3 with a Guideline of 38 and criminal history category VI, the average sentence was 158 months, and the median was 180. Seventy five percent of defendants received a below guidelines sentence. This does not include defendants who received a 5K1.1 departure for substantial assistance. The full JSIN report is attached as Exhibit 3.

## Conclusion

Mr. Carpenter respectfully requests that after considering the facts of this case and considering all grounds for variance and departure, the Court consider imposing a sentence of less than sixty months, which will recognize the seriousness of the offense but also allow him a chance to live a positive life upon release, under appropriate supervision.

Respectfully submitted this 5th day of June, 2024.

/s/ Wade V. Davies
WADE V. DAVIES [BPR #016052]
GEORGIA A. MILLER [BPR #041197]
606 W. Main Street, Suite 300
P. O. Box 1126
Knoxville, TN 37901-1126
(865) 637-0661
wdavies@rdjs.law

*Counsel for Benjamin Alan Carpenter*